SUCCESSFUL FARMING PUBLISHING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33190. Promulgated May 12, 1931.

*Charles D. Hamel, Esq.,* and *Lee I. Park, Esq.,* for the petitioner. *Elden McFarland, Esq.,* for the respondent.

OPINION.

LANSDON : The respondent has asserted deficiencies in income taxes for the calendar years 1922 and 1923, in the respective amounts of $12,694.43 and $9,213.31. The petitioner contends (1) that amounts expended in establishing and maintaining a magazine circulation structure are deductible as ordinary and necessary business expenses, and (2) in the alternative that if such expenditures are of a capital nature, they should be amortized over the life of the subscription contracts.

The record in this proceeding includes a voluminous stipulation of facts entered into by the parties and filed at the hearing, which we incorporate by reference as a part of this report.

The petitioner is a corporation organized in 1905, to take over the publishing business started in 1902 by E. T. Meredith. It maintains its principal office at Des Moines, Iowa.

For many years prior to the taxable year the petitioner had been engaged in publishing a magazine known as *Successful Farming.* In 1922, it purchased a publication called *The Dairy Farmer* for a consideration of $50,000. On or about September, 1922, the petitioner started a new publication called *Fruit, Garden and Home,* which name was later changed to *Better Homes & Gardens.* Immediately thereafter a campaign was started to build up circulation of *The Dairy Farmer* and establish a circulation for *Fruit, Garden and*

*Home*. The principal method used consisted of giving prizes to individuals or clubs for securing subscriptions. In 1922, the petitioner expended $15,060.10, in addition to regular circulation department expenses, in securing subscriptions for *The Dairy Farmer* and, in 1923, it expended $49,729.13. Of the latter amount, $5,338.77 represented expenses of securing renewal subscriptions. In building up circulation for its new magazine, *Fruit, Garden and Home*, the petitioner expended $92,828.74 in 1922, in addition to its regular circulation department expenses, of which amount $72.75 was spent on renewal schemes. In 1923, it spent $104,454.28 in securing new subscriptions for *Fruit, Garden and Home*, and $13,899.91 in securing renewal subscriptions.

Of the above amounts the respondent has allowed deductions for all expenditures in securing renewal subscriptions, and, in addition, has allowed the amount of $15,060.10 expended in 1922 on circulation of *The Dairy Farmer*, the circulation structure not having been increased during the year. He has disallowed the entire amount of $92,755.99 expended in building up circulation of *Fruit, Garden and Home*, since it represents an expenditure to acquire new subscriptions, that magazine having no circulation at the beginning of the period. For 1923 he has allowed $47,339.19 of the amount expended in securing new subscriptions to *Fruit, Garden and Home* as the proper portion applicable to maintenance of the established circulation structure. He disallowed the total amount of $44,389.36, expended in 1923, to secure new subscriptions to *The Dairy Farmer*.

On January 1, 1922, *The Dairy Farmer* had a total circulation of 57,745. At the end of that year its circulation was 56,766. *Fruit, Garden and Home* had no circulation at the beginning of 1922, but at the end of the year it had a circulation of 151,547. At the end of 1923, *The Dairy Farmer* had a circulation of 126,848, while the circulation of *Fruit, Garden and Home* at that time was 297,290. New subscriptions, expirations and renewals were as follows:

| Items | 1922 | | 1923 | |
|---|---|---|---|---|
| | The Dairy Farmer | Fruit, Garden and Home | The Dairy Farmer | Fruit, Garden and Home |
| New subscriptions | 6,589 | 115,525 | 74,351 | 200,580 |
| Expirations | 7,856 | (¹) | 11,612 | 120,248 |
| Renewals | 288 | (¹) | 7,343 | 18,652 |

¹ None.

The petitioner contends that it is entitled to deduct from income all expenditures in securing subscriptions to its magazines. It contends in the alternative that if such amounts are not deductible in

the years expended, they should be amortized over the life of the subscription contracts.

We have heretofore discussed newspaper and magazine circulation structure and have uniformly held that it is an intangible capital asset. *Danville Press Inc.*, 1 B. T. A. 1171; *Gardner Printing Co.*, 4 B. T. A. 37; *Herald-Despatch Co.*, 4 B. T. A. 1096; *Walter S. Dickey*, 14 B. T. A. 1295; and *Tulsa Tribune Co.*, 21 B. T. A. 1405; cf. *News Publishing Co.*, 29 Fed. (2d) 955. In *Public Opinion Publishing Co.*, 6 B. T. A. 1255, we said:

> The specific question presented by this proceeding is whether when such an asset is developed by the corporation itself and the cost thereof charged to expense, such cost is a capital expenditure. The facts show that the purpose of the two campaigns was not only to maintain the number of subscribers, but to increase it. To the extent that the expenditures maintained the number of subscribers, they may be ordinary and necessary expenses, but we are unable to determine the amount allocable thereto. * * *

Circulation structure is an asset which must be continually supported by bringing in new subscriptions to replace those which are continually expiring. *Gardner Printing Co., supra.* The cost of so supporting the circulation structure is an ordinary and necessary business expense, but the cost of building up or establishing a circulation structure must be charged to capital.

We do not agree with petitioner's alternative contention that the cost of a subscription contract should be amortized over the life of the contract. Circulation structure is more than mere subscription contracts and the value which goes into circulation structure with a new subscription contract is not all gone upon the expiration of the contract. As we said in *Herald-Despatch Co., supra:*

> The term circulation, as used in newspaper publishing businesses, comprehends something much broader than what may be characterized as mere subscription lists. As a practical matter it appears to be rather difficult to distinguish it from good will. It possesses many of the attributes of good will, and yet comprises other elements not common to the latter. It comprehends, on the one hand, a body of subscribers whom experience has demonstrated may be relied upon with some degree of certainty to continue to take and renew their subscriptions to the paper in the future. * * *

In *Danville Press, Inc., supra*, the taxpayer claimed the right to write off a portion of the cost of subscriptions upon the expiration of the subscription contracts. In disallowing the claim we said:

> * * * The taxpayer urges that, as all of these subscriptions expired within a period of 12 months, it is entitled to write off within that period the total amount paid for such subscriptions. This necessarily involves the proposition that at the end of such period the subscription list purchased by it had no value. We can not agree that this is so, nor can we agree that what the taxpayer purchased was 9,000 contracts expiring within 12 months. It purchased an asset which was a subscription list subject to fluctuations from time to time.

Cf. *Moon Journal Publishing Co.*, 13 B. T. A. 1379.

We conclude that the cost of securing new subscriptions should be allocated between expense and capital according to the number of such subscriptions required to replace expirations and cancellations during the year and the number by which the circulation structure is increased. All of the facts necessary to a recomputation under Rule 50 are contained in the tabulations attached as exhibits to the stipulation.

Circulation structure is in the nature of a permanent capital asset, the cost of which may not be written off as the subscriptions expire.

*Decision will be entered under Rule 50.*