*Decision will be entered under Rule 50.*

THRIFTICHECK SERVICE CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74819. Filed March 22, 1960.

*John T. Powell, Esq.*, and *James D. St. Clair, Esq.*, for the petitioner.

*James E. Markham, Jr., Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in the petitioner's income tax for the fiscal year ended April 30, 1954, in the

amount of $74,242.55. On brief the respondent conceded that the petitioner is entitled to a claimed deduction of $12,500 on account of a payment made under an agreement not to compete. There remain for decision the question whether petitioner is entitled to deduct, under section 23(1) of the Internal Revenue Code of 1939, a claimed amount of $119,817.27 as a portion of the cost of 200 customer contracts acquired on April 30, 1953, and the question whether petitioner is entitled to any deduction on account of losses sustained in the taxable year on contracts purchased.

### FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

The petitioner (the name of which was originally Thrifticheck Corporation) is a corporation organized under the laws of the State of New York on or about February 3, 1953, with principal office in New York City, New York. Its income tax return for the fiscal year ended April 30, 1954, was filed with the district director of internal revenue for the Upper Manhattan District of New York.

Bankers Development Corporation, hereinafter referred to as Bankers, was incorporated in 1917 in the State of Delaware, and continuously did business in New York City until April 30, 1953, when it was liquidated. Jerome E. Casey was the sole stockholder of Bankers. Phillip K. Barker was president and George Pace and John Virgin were employees of Bankers. Prior to liquidation Bankers, besides carrying on a business of personal solicitation of savings accounts for banks, also carried on the business of selling to and installing in banks throughout the United States a checking account system known as "ThriftiCheck Service Plan." It entered into contracts with its various customers, pursuant to which it furnished a service representative to supervise and assist in the organization and installation of the plan in the banks, to instruct the bank employees, and to render other assistance necessary until the plan was completely installed and functioning. Bankers also supplied the banks with all the materials and forms necessary to handle the accounts opened under the plan. This material included checkbooks, checkbook covers, passbooks, promotional booklets, pamphlets, counter cards, lobby posters, and mats for newspaper advertising. It also furnished for the banks' use checkbook stapling machines and printing presses for printing depositors' names on checks.

Six contracts were introduced as being typical of its various contracts. Under each agreement the bank would pay Bankers an amount of $1.50 for each account opened with the bank under the plan (a fixed amount sometimes being paid at the beginning), and, in addition, an amount of 1 cent or 1¼ cents per check thereafter

sold by the bank to its customers. Bankers agreed to continue, during the term of the contract, to furnish all necessary materials and to send its representatives to the bank as requested for the purpose of furthering promotional advertising or giving accounting counsel.

The contracts between Bankers and the banks varied in some of the details, but each was for a period of 5 years and was automatically renewable for a further term of 5 years "upon the same terms and conditions" unless either party should, within a stated time before expiration (varying from 3 months to 1 year) giving notice in writing of its election to terminate the agreement. In each instance the bank agreed that during the term of the agreement it would not install or operate any other "pay-as-you-go" or special checking account plan.

Each contract contained a provision for discontinuance of the plan by the bank without penalty but did not contain a provision for discontinuance by Bankers. The latest contracts provided for cancellation by the banks on any anniversary date of the contract after the second anniversary upon 12 months' prior written notice. Some of the earlier contracts contained the same provision, except upon 6 months' prior written notice. The earliest contracts, dating back to 1941 and 1942, provided for cancellation by the bank at any time by giving 6 months' written notice.

On April 24, 1953, a purchasing group consisting of Barker, Pace, and Virgin entered into an agreement with Casey to purchase certain assets of Bankers on April 30, 1953. Such contract provided that the purchasing group would organize or acquire a New York corporation having the word Thrifticheck in its corporate title, and having power to engage in the business which Bankers was then engaged in; that the group would cause Thrifticheck Corporation to authorize the conduct of such business; that Casey would acquire an unencumbered title to all the assets of Bankers (with certain exceptions) and then sell such assets to Thrifticheck for $337,503.93; that Casey would agree not to enter into any business in competition; and that he would cause Bankers or its trustees in dissolution to effect the transition of customer relations by appropriate notifications to customers or otherwise.

On April 30, 1953, Barker, on behalf of the purchasing group, acquired all the capital stock of petitioner by paying in the sum of $25,000 cash. During the year in question the stockholders were Barker, Virgin, Pace, Nicholas Hefele, Frederick Schroeder, and Nat Kaufman, none of whom had owned any interest in Bankers. Each of them was a former employee of Bankers. Casey did not own any interest in the petitioner.

Bankers was liquidated on April 30, 1953, and Casey, its sole stockholder, acquired all its assets in liquidation. On the same day a

contract of sale was entered into between Casey, as seller, and the petitioner, as purchaser, by which there were transferred to the petitioner at an agreed purchase price of $337,503.93, payable in installments, the assets which Casey had received in liquidation of Bankers, with certain exceptions. The contract provided in part as follows:

THAT on this 30th day of April, 1953, JEROME E. CASEY, of Guilford, Connecticut, hereinafter called the "seller", for and in consideration of the purchase prices set opposite each item or group of items in the schedules hereto annexed aggregating Three Hundred Thirty-Seven Thousand and Five Hundred Three Dollars and Ninety-Three Cents ($337,503.93) to be paid to him with interest at the rate of Two per centum (2%) per annum on unpaid balances thereof by ThriftiCheck Service Corporation, a New York corporation, hereinafter called the "buyer", as provided in a certain debenture bearing date even herewith, and of the covenants and agreements hereinafter made.

I. Has bargained and sold and by these presents does grant and convey unto the buyer the goods and chattels particularly described and mentioned in Schedules A & B hereunto annexed comprising and intended to comprise, whether particularly mentioned in said schedules or not, all of the inventory, supplies, furniture, fixtures and other physical assets with which Bankers Development Corporation, now in dissolution, has heretofore to this date carried on its business, excepting its automobile, but including its leasehold interest to June 30, 1953, in certain check imprinters owned by ThriftiMatic Corporation and now in major part in the possession of the customers named in Schedule hereof, as well as all of the supplies and other property formerly of Bankers Development Corporation in the hands of the said customers pursuant to their contracts with Bankers Development Corporation, and comprising and intended to comprise all of the inventory, supplies, furniture, fixtures and other physical properties which Bankers Development Corporation in dissolution has transferred to the seller in partial distribution of its assets to him as its only stockholder; and

II. Has bargained and sold, and by these presents does transfer, set over and assign unto the buyer all the notes, all the customer contracts and the money to grow due thereon on and after May 1, 1953, the lease upon part of premises at 100 Park Avenue, New York City, sub-leases, the trade name and trademark "ThriftiCheck" and all registrations thereof, and the good will of the business conducted under the said name, unearned advances and deferred assets as mentioned and described in Schedules C–D hereto annexed, as well as all of the claims of Bankers Development Corporation of every nature and description against ThriftiMatic Corporation and the interest of the seller therein, and the good will of the business which Bankers Development Corporation has heretofore conducted, comprising and intended to comprise, whether specifically mentioned herein or in the said Schedules or not, all of the assets formerly of Bankers Development Corporation, now in dissolution, except its cash in hand and on deposit and its current accounts receivable to April 30, 1953, and the physical assets granted and conveyed or excepted in Item I hereof, and all of the assets with said exceptions which Bankers Development Corporation in dissolution transferred, set over and assigned to the seller in partial distribution of its assets to him as its only stockholder.

\* \* \* \* \* \* \*

AND the buyer as part of the consideration for the foregoing sale, transfer and assignment does for itself and its successors and assigns covenant and

agree to and with the seller and his executors, administrators and assigns, as follows:

1. It hereby assumes and will perform faithfully and discharge fully and promptly all of the obligations of Bankers Development Corporation in dissolution upon the customer contracts mentioned and described in Schedule D hereof for the full term and any renewal thereof, and all of the seller's obligations thereunder upon his assumption thereof, and will indemnify the seller and his executors and administrators and Bankers Development Corporation and the trustees in its dissolution against all claims for breach or default therein occurring after April 30, 1953;

\*    \*    \*    \*    \*    \*    \*

4. It hereby assumes and will discharge all of the obligations of Bankers Development Corporation now in dissolution and all of the seller's obligations under his assumption thereof to any and all salesmen and former salesmen of Bankers Development Corporation, including the Estate of B. T. Moran for commissions earned by them, or any of them, on and after May 1, 1953, or claimed to have been earned on and after that date and established, and will indemnify the seller, Bankers Development Corporation and the trustees in its dissolution with respect thereto whether said commissions are earned or claimed under contracts in writing or otherwise, but in no case is any commission to be deemed to have been earned by the seller or to be due to him except as provided in a further agreement between the seller and the buyer of even date respecting his not competing with the buyer in its business and the compensation to be paid to him thereunder.

5. It hereby assumes and will discharge all of Bankers Development Corporation's obligations, and those of the seller upon his assumption thereof, on its lease of part of the premises at 100 Park Avenue, New York City.

The assets included in the schedules attached to the contract and the purchase prices set opposite each item or group of items, were as follows:

| | |
|---|---:|
| Inventory | $20,589.73 |
| Office furniture | 9,183.09 |
| Notes | 11,000.00 |
| Unearned advances and sales accounts | 2,600.00 |
| Trademark "ThriftiCheck" and goodwill | 5,000.00 |
| Customer contracts (200 listed by name) | 290,818.61 |

The total of these items, plus an obligation of Bankers to four customers in the amount of $1,687.50 which petitioner assumed, equals the purchase price stated in the contract of $337,503.93.

On April 30, 1953, the petitioner executed a debenture in favor of Casey in the principal amount of $337,503.93 with interest, payable in monthly installments, beginning June 15, 1953, as follows:

| | |
|---|---:|
| June 15, 1953, to May 15, 1954, inclusive | $7,821.12 |
| June 15, 1954, to May 14, 1955, inclusive | 6,553.60 |
| June 15, 1955, to May 15, 1956, inclusive | 7,019.35 |
| June 15, 1956, to May 15, 1957, inclusive | 4,597.84 |
| June 15, 1957, to May 15, 1958, inclusive | 3,010.91 |
| June 15, 1958, to May 15, 1959, inclusive | 366.68 |

The petitioner assigned to Casey, as security for payment of the debenture, the 200 customer contracts, all money due or to become due petitioner under such contracts, all property of the petitioner in the possession of any of the banking institutions under such contracts, and all trademarks, trade names, patents, and copyrights theretofore assigned by Casey to the petitioner. The petitioner further agreed that, so long as any installment of the debenture should remain unpaid, it would not sell or encumber any of such properties or any money to become due under any of the contracts.

On April 30, 1953, the petitioner and Casey entered into a separate agreement in which Casey agreed not to compete with the petitioner, in consideration of which petitioner agreed to pay Casey an amount of $12,500 annually for life, with a provision for further payments to his executor or widow if he should die before April 30, 1963. One of the recitations in the contract is as follows:

WHEREAS Bankers Development Corporation to April 30, 1953, has been engaged in the business of furnishing certain service and supplies to banks and other financial institutions, chief among which has been supplies and service to banks marketed under the trade-name "ThriftiCheck", and this corporation [the petitioner] has been organized to carry on that business and Casey has sold to it certain of the assets formerly of Bankers Development Corporation, including the said name "ThriftiCheck" and the registration thereof, and the good will of said business with the intention on the part of both buyer and seller that this corporation [Thrifticheck Service Corporation] shall carry on the said business:

The 200 customer contracts which the petitioner acquired had been entered into at various times. Some of them had not yet been put into effect. Of the six contracts introduced in evidence as representative of those acquired by the petitioner, one had been in existence for about 12½ years, one about 10½ years, one about 6 years, one slightly less than 5 years, one about 3½ years, and one about 1 year.

In the negotiations leading up to the above contract, Barker and Casey bargained separately for the prices of the above-listed categories of property. In such negotiations Barker determined the number of months remaining, after April 30, 1953, of the term of each contract, made an estimate of the average gross income that might be expected from each contract per month, and, based thereon, arrived at a figure which he, Pace, and Virgin believed represented the value of each contract. Casey had also valued each contract by the same method, but had arrived at a total valuation of all the contracts which was $14,000 in excess of the aggregate value calculated by Barker. In the contract of sale the price of these 200 contracts was based upon Casey's estimate of value.

The petitioner commenced business on May 1, 1953. The opening entries on its books as of that date were as follows:

| | | |
|---|---:|---:|
| Cash | $25,000.00 | |
| Capital stock | | $25,000.00 |
| Furniture and fixtures | $9,183.09 | |
| Inventory | 20,589.73 | |
| Patents and trade name | 5,000.00 | |
| Contracts | 290,818.61 | |
| Notes receivable | 11,000.00 | |
| Sales advances | 2,600.00 | |
| | $339,191.43 | |
| Debentures | | $337,503.93 |
| Deposits on imprinters—client banks | | 1,687.50 |
| | | 339,191.43 |

The petitioner continued basically the same type of business as that which had been conducted by Bankers, in that it continued to sell the ThriftiCheck Service Plan throughout the United States. From April 30, 1953, to the time of the hearing, of the 200 contracts acquired by the petitioner, 35 were canceled and 88 were renegotiated at a lower price. During that period the petitioner entered into 225 new contracts with banks of which 12 have been canceled. The petitioner also continued the personal solicitation of savings accounts, although this was discontinued about the end of its first fiscal year. The petitioner continued to conduct its business at 100 Park Avenue, New York, where Bankers had done business for about 2¼ years (Bankers having previously done business at 31 Nassau Street). Few banking customers ever visited the place of business of either Bankers or of the petitioner. Bankers had not entered into any contracts with any banks in the New York City area. Petitioner has had a profitable business since its beginning.

In its income tax return for the fiscal year ended April 30, 1954, the petitioner reported net income of $25,239.71. It claimed a deduction of $119,817.27 as "Amortization of deferred contract expense." This total amount was calculated by amortizing, as was done on the petitioner's books of account, an amount set up as the cost of each contract, over the portion of its term remaining after April 30, 1953. The respondent disallowed the claimed deduction, stating in the notice of deficiency:

It has been determined that the $290,818.61 allegedly agreed to be paid for customers' contracts upon your acquisition of the business formerly conducted by Bankers Development Corporation constitutes consideration for an intangible asset, namely the going business, the useful life of which is not limited to any period that can be estimated with reasonable accuracy. Therefore, the amortization deduction of $119,817.27 claimed in respect thereto has been disallowed in accordance with the provisions of section 23(1) of the 1939 Internal Revenue Code and Regulations 118, Section 39.23(1)–3.

OPINION.

The principal question is whether for the fiscal year ended April 30, 1954, the petitioner is entitled to deduct any portion of $290,818.61, its cost of the contracts described in our Findings of Fact, for exhaustion thereof pursuant to section 23(1) of the Internal Revenue Code of 1939.[1] In its return it claimed a deduction of $119,817.27, which was disallowed by the respondent.

The respondent's position is that the petitioner purchased the going business formerly conducted by Bankers, the principal element of which was the customer structure, that the price of $290,818.61 was paid for the customers' contracts in the aggregate, that this was an intangible capital asset, the useful life of which is not definite or capable of being estimated with reasonable certainty, and that accordingly the petitioner is not entitled to deduct, through an allowance for depreciation, any part of the stated cost of the contracts. He refers to section 39.23(1)-3 of Regulations 118.[2]

The petitioner contends that while a total price of $290,818.61 was paid for the 200 contracts, in reality it purchased 200 separate contracts, each being the subject of bargaining at the time the petitioner acquired them, that each was property used in the trade or business, that each had a limited life, namely, the unexpired portion of the term of 5 years provided for in the contracts, and that for each contract the petitioner is entitled to depreciation based upon the portion of its term remaining at the time of acquisition on April 30, 1953. It cites as authority for the proposition that the cost of a contract may be amortized over its term, the cases of *Reserve Natural Gas Co. of Louisiana*, 12 B.T.A. 219, *Bernicedale Coal Co.*, 16 B.T.A. 696, and *Flynn, Harrison & Conroy, Inc.*, 21 B.T.A. 285, the latter case involving a contract which was automatically renewable unless notice was given to the contrary.

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

* * * * * * *

(1) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

[2] Sec. 39.23(1)-3 *Depreciation of intangible property.* Intangibles, the use of which in the trade or business or in the production of income is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. Intangibles, the use of which in the business or trade or in the production of income is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business or in the production of income for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible assets may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior thereto to the satisfaction of the Commissioner. No deduction for depreciation, including obsolescence, is allowable in respect of good will.

The above cases involved the purchase of individual contracts and in our opinion are not governing here. It is clear from the evidence in the instant case that it was the intention of both parties to the transaction that the petitioner should acquire and continue the going business of Bankers and that this was done. An important, if not the most important, asset of Bankers was its customer structure, represented by the 200 contracts in question. While in the contract of purchase the contracts were listed by names of customers, no specific price was set forth for the individual contracts. Rather, the sum of $290,818.61 was paid for the aggregate of such contracts. While in negotiations leading up to the fixing of the price to be paid, each party to the transaction did take into consideration the remaining unexpired term of each contract and the estimated income which might be expected over such remaining term, this does not establish that individual contracts were purchased. Nor in our opinion is it determinative that the petitioner entered the contracts on its books at fixed costs and amortized such costs.

No case precisely in point has come to our attention, but there are analogies in several cases. In the early case of *Danville Press, Inc.*, 1 B.T.A. 1171, the petitioner purchased, among other assets, 9,000 newspaper subscriptions which expired in from 1 to 12 months. We there held that what the petitioner purchased was a subscription list, and not individual contracts, that such asset continued to have value, subject to fluctuation from time to time, and that the petitioner was not entitled to amortize the cost of such asset. See also *Meredith Publishing Co.* v. *Commissioner*, (C.A. 8) 64 F. 2d 890, affirming *Successful Farming Publishing Co.*, 23 B.T.A. 150, in which it is stated that a circulation structure is not a mere aggregation of disconnected individual subscriptions, but rather a combination of such units with a measurable degree of permanency. In *Anchor Cleaning Service, Inc.*, 22 T.C. 1029, it was held that the purchase of accounts of customers regularly subscribing for cleaning services should be considered as the purchase of a single intangible asset and not the purchase of individual accounts. It was there stated that the fact that the total price paid was based upon the expected return from each customer did not justify the conclusion that each customer's account was a separate unit or asset purchased.

We recognize of course that the instant case differs to some extent from one involving the acquisition of a mere customer list not involving enforcible contracts, but we are of the opinion that the same rule should apply. Actually involved in the acquisition of the 200 contracts was the acquisition of the total customer relations of the seller and to this extent there may be involved some element of good-

will, particularly since the contracts were to be automatically renewed in the absence of notice to the contrary, and the experience of both Bankers and the petitioner with respect to these contracts indicated a likelihood of renewal in a large number of cases; and the cost of goodwill is not subject to a deduction under section 23(1). In the whole transaction a separate amount of $5,000 was designated as being for "Trademark 'ThriftiCheck' and goodwill," which was listed on the books of the petitioner as "Patents and Trade-name." Apparently the "goodwill" these referred to had to do with the trade name "ThriftiCheck" and not goodwill in the usual sense as attached to the going business of Bankers. However, wholly aside from any goodwill element, we think that under the circumstances here presented, the acquisition of the 200 contracts should be treated as the acquisition of a single asset which is not exhausted by the passage of time, but is of such a continuing useful life as to preclude the allowance of any deduction for exhaustion thereof. It should be pointed out that the purchase here in question is not similar to the purchase of a contract or contracts calling for the payment of the determinable amount of income over an ascertainable period. There was no minimum of service which each bank undertook to receive and pay for. The amount of income which would result from any individual contract would depend upon the number of customers of the bank who might elect to use the Thrifticheck system.

In view of the foregoing, we hold that the petitioner is not entitled to deduct any amount in the year in question as amortization of the cost of the contracts. The petitioner also contends that it is entitled to a deduction in the year in question on account of any cancellation of contracts which were purchased, although Barker testified that he did not believe any of the contracts were canceled in such year. In any event, what has been said above disposes of this contention. The cancellation of a contract would not destroy the value of the larger asset of which it was a part, but would merely reduce its value, which might be restored by the acquisition of new customers under similar contracts. Actually the petitioner did acquire many new customers. We are not called upon here to determine whether any cost of acquiring new customers is deductible. Suffice it to say that in our opinion the petitioner will not be entitled to deduct any cost of the contracts which it purchased until its customer structure becomes worthless or is disposed of.

The respondent having conceded on brief that petitioner is entitled to deduct an amount of $12,500 paid to Casey under his agreement not to compete,

*Decision will be entered under Rule 50.*