RICHARD M. BOE AND MARY LOIS BOE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 73825.   Filed January 31, 1961.

*W. Lee McLane, Jr., Esq.,* and *Ted Rojek, Esq.,* for the petitioners.
*Richard G. Worden, Esq.,* for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioners' income tax for the taxable years 1952, 1953, and 1954 as follows:

| Year | Deficiency |
| --- | --- |
| 1952 | $20,852.16 |
| 1953 | 2,759.14 |
| 1954 | 6,551.33 |

The sole issue remaining for our consideration is whether petitioners may deduct the cost of medical service contracts which were terminated during each of the years before us, and if so, the cost of these contracts.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

Richard M. Boe, also known as M. Richard Boe, and Mary Lois Boe are husband and wife residing in Alameda, California. They filed timely joint income tax returns for the years in question, including an amended return for the year 1954, with the district director of internal revenue at San Francisco, California.

Richard M. Boe, hereinafter referred to as petitioner, is a medical doctor, and has been engaged in the practice of medicine since 1920. Beginning in 1929, and continuing (except for service in the United States Navy from 1942 to 1946) until August 1, 1947, petitioner was employed by Ferd W. Callison, M.D., hereinafter referred to as Callison. For 25 years prior to August 1, 1947, Callison had been engaged in a contract medical practice in San Francisco and environs, including Alameda.

This medical, surgical, and hospital service practice consisted of contracts between subscribers and F. W. Callison, M.D., & Staff, wherein the Staff, of which petitioner was a member, agreed to pro-

vide comprehensive health care in return for the regular payment, usually for 6 months in advance, of a sum designated as "Dues." These contracts were terminable at will by either party upon written notice.

Prior to August 1, 1947, Callison wished to retire from practice and dispose of the membership contracts and his organization. One of the members of Callison's staff, Frank W. Gorham, M.D., interested three other younger doctors in purchasing the organization, and negotiated with Callison for the sale thereof. This group, consisting of Gorham, petitioner, William P. Gilbert, M.D., and George Heppner, M.D., examined the amount and nature of the contracts, and on July 23, 1947, purchased the contract medical practice from Callison. Pertinent parts of the purchase agreement follow:

THIS AGREEMENT, made and executed this 23rd day of July, 1947, by and between F. W. CALLISON of San Francisco, California, First Party, and FRANK W. GORHAM, WILLIAN P. GILBERT, and GEORGE J. HEPPNER, of San Francisco, California, and M. R. BOE, of Alameda, California, jointly and severally, Second Parties,

WITNESSETH:

WHEREAS, First Party has conducted and operated a contract medical practice on a group and individual basis rendering medical, surgical and hospital services in connection with agreements with individuals and groups, and

WHEREAS, the Second Parties have been associated with the First Party in the conduct of such practice and are thoroughly familiar with the procedure, policies and obtaining of said practice and conversant with the records, files and financial details of said practice and are desirous of continuing and expanding the operation of such practice, and

WHEREAS, it is agreed among all of the parties hereto that the Goodwill is an important and the principal part of the assets being sold by First Party to Second Parties.

Now, THEREFORE, for and in consideration of the premises and of the terms, covenants and conditions hereof, the Parties do hereby mutually agree as follows:

I

The effective date of this Agreement shall be 12:00 midnight, July 31, 1947.

II

First Party does hereby sell, assign, transfer, set over, and deliver unto Second Parties all of the right, title, and interest in and to the contract medical practice known and operated and conducted by First Party, including, without in any wise limiting the generality of the foregoing, all of the following:

(a) The Goodwill of the said practice;

(b) All moneys and things of value receivable or received which have accrued or may accrue after the effective date hereof on or for the account of said practice including prepaid dues paid for services to be rendered after July 31, 1947.

(c) All interest of every kind and character in all contracts, understandings or arrangements with individuals or groups for medical, surgical, and/or hospital services. The First Party represents that no individual or group contracts as

specified herein are or shall be retained by First Party, and that all such contracts and agreements are hereby transferred by First Party to the Second Parties;

(d) That portion of the furniture, fixtures, fittings, instruments, and equipment, together with the records and all other personal property and chattels, as more specifically set forth in Exhibit "A" hereto attached, the title to which is to be retained and remain in the First Party, and will be left by First Party on the premises hereinafter described, until the delivery of the Bill of Sale, as hereinafter provided to be made to Second Parties.

\* \* \* \* \* \* \*

(e) The medical and surgical supplies, drugs and accessories used in connection with said practice.

\* \* \* \* \* \* \*

## IV

The purchase price to be paid by Second Parties to First Party for said property hereby sold and transferred shall be the sum of $255,000, to be placed in escrow by Second Parties upon the execution hereof, payable to the First Party upon the effective date hereof.

The purchase price and consideration aforesaid is divided as follows:

(a) The furniture, fixtures, fittings, instruments and equipment together with all other personal property and chattels as more specifically set forth in Exhibit "A" hereto attached, at a value equal to the amount reflected on the books of the First Party on the effective date hereof at the cost of each and all of the items thereof less depreciation if any.

(b) The balance thereof to the Goodwill and other properties hereby transferred of said practice.

\* \* \* \* \* \* \*

## VI

The said Second Parties hereby specifically covenant and agree \* \* \* to carry on, maintain and develop said practice to the best of their ability in maintaining the good will and public regard held thereof.

\* \* \* \* \* \* \*

## IX

The said Second Parties agree to do, maintain and perform, from and after the effective date hereof, all of the obligations of every kind and character of the First Party under the terms of all contracts, understandings, arrangements and agreements made with individuals and groups, as herein referred to, for medical, surgical and hospital services, which contracts, understandings, arrangements and agreements are part of the assets referred to in this agreement and are being transferred in accordance with the terms hereof by the First Party to the Second Parties.

Callison also covenanted not to compete either by practicing or by associating himself with another similar organization.

Of the contract price, $2,346.27 represented the cost of furniture, fixtures, and other tangible assets purchased. The purchasers also agreed to pay an additional sum of $14,000, and incurred acquisition costs of $3,389.09, so that the total purchase price was $272,389.08.[1]

---

[1] *So stipulated.* The 1 cent difference is not explained.

The total number of medical service contracts outstanding on August 1, 1947, was 8,984, and the purchasers, in partnership form, allocated the entire purchase price less the cost of the physical assets, namely $270,042.81, to these contracts. This partnership, hereinafter called the Gorham partnership, continued to operate the contract medical practice until September 15, 1950.

The following table reveals the status of the contracts sold by Callison and the extent of new contracts acquired:

| Date | Original contracts in force | Contracts terminated during period | New contracts in force | Total contracts in force |
|---|---|---|---|---|
| Dec. 31, 1947 | 8,522 | 462 | 448 | 8,970 |
| Dec. 31, 1948 | 7,792 | 730 | 857 | 8,649 |
| Dec. 31, 1949 | 7,152 | 640 | 1,283 | 8,435 |
| Sept. 15, 1950 | 6,691 | 461 | 1,523 | 8,214 |
| Aug. 31, 1951 | 6,049 | 642 | 1,620 | 7,669 |
| Aug. 31, 1952 | 5,514 | 535 | 1,861 | 7,375 |
| Aug. 31, 1953 | 5,163 | 351 | 2,227 | 7,390 |
| Mar. 31, 1954 | 4,885 | 278 | 2,289 | 7,174 |
| Dec. 31, 1954 | 4,615 | 270 | 2,381 | 6,996 |

The Gorham partnership claimed deductions totaling $69,019.30 for the period August 1, 1947, to September 15, 1950. This amount represented the total number of medical contracts terminated (2,293) during that period multiplied by $30.10, the amount assigned as the cost of each medical contract. The 6,691 original contracts in force on September 15, 1950, had an assigned cost basis of $201,023.51.

On September 15, 1950, petitioner and Gilbert purchased the partnership interests of Gorham and Heppner, incurring additional acquisition costs of $5,997.58. The contract medical practice continued from that date and throughout the years involved under the name of the Boe-Gilbert Medical Group. Both this and the prior partnership continued the business begun by Callison, using the same offices and records. Neither partnership capitalized the cost of acquiring any medical contracts after August 1, 1947.

The Boe-Gilbert partnership deducted on its partnership returns the allocated cost of medical contracts terminated, each contract having an assigned cost of $30.94, as follows:

| Taxable period | Number of contracts terminated | Amount |
|---|---|---|
| Sept. 16, 1950 to Aug. 31, 1951 | 642 | [1] $19,863.48 |
| Sept. 1, 1951 to Aug. 31, 1952 | 535 | 16,552.90 |
| Sept. 1, 1952 to Aug. 31, 1953 | 351 | 10,859.84 |
| Sept. 1, 1953 to Mar. 31, 1954 | 278 | 8,601.32 |
| Apr. 1, 1954 to Dec. 31, 1954 | 270 | 8,353.80 |

[1] Not here in issue.

The Boe-Gilbert partnership deducted the above sums as "Membership write-off," an expense item.

During the negotiations between Gorham and Callison, no allocation of the price among the various items purchased was attempted. The covenant by Callison not to compete was similarly not allocated a share of the purchase price. The amount of $270,042.81 included goodwill, accounts receivable, membership contracts, medical and surgical supplies, and the covenant not to compete, and was a lump-sum payment for the organization and business conducted by Callison.

### OPINION.

Despite the categorization of the membership writeoffs as expenses in the Boe-Gilbert partnership income tax returns, petitioner's contention is that he is entitled to the claimed deductions under section 23(1) of the Internal Revenue Code of 1939 [2] and its counterpart, section 167(a) of the Internal Revenue Code of 1954.

Respondent's position is that petitioner and his associates purchased the entire going business formerly conducted by Callison; that the price, except for the small amount allocated to furniture and fixtures, was primarily for goodwill; that no part of the price is allocable to the medical service contracts; and that even if a part of the purchase price had been paid specifically for the 8,984 contracts, it was paid for these contracts in the aggregate. Respondent concludes that this intangible capital asset had a useful life that was indefinite and incapable of being estimated with reasonable certainty, and therefore no depreciation can be allowed.[3]

The basic disputes are whether any portion of the total price is allocable to the contracts, jointly or severally, and if so, whether the contracts collectively constitute one capital asset or whether each individual contract is a separate capital asset.

Petitioner presents a variation on a rather settled theme. The courts have on numerous occasions held that subscription lists and

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

*     *     *     *     *     *     *

(1) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
  (1) of property used in the trade or business, or
  (2) of property held for the production of income.

[3] Relying on sec. 39.23(1)–3, Regs. 118, which reads:

"*Depreciation of intangible property.* Intangibles, the use of which in the trade or business or in the production of income is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. Intangibles, the use of which in the business or trade or in the production of income is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business or in the production of income for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior thereto to the satisfaction of the Commissioner. No deduction for depreciation, including obsolescence, is allowable in respect of good will."

The comparable regulation under sec. 167(a) of the 1954 Code is sec. 1.167(a)–3, Income Tax Regs.

similar items constituted a single capital asset, and as such continued to have value despite fluctuations and alterations. *Thrifticheck Service Corporation*, 33 T.C. 1038 (1960), on appeal (C.A. 2) ; *Metropolitan Laundry Co.* v. *United States*, 100 F. Supp. 803 (N.D. Cal. 1951). These decisions involved newspaper subscription lists, *The Danville Press, Inc.*, 1 B.T.A. 1171 (1925) ; magazine circulation structures, *Meredith Pub. Co.* v. *Commissioner*, 64 F. 2d 890 (C.A. 8, 1933) ; insurance policyholders, *Commercial National Insurance Co.*, 12 B.T.A. 655 (1928) ; natural gas consumers, *Houston Natural Gas Corp.* v. *Commissioner*, 90 F. 2d 814 (C.A. 4, 1937) ; cleaning service customers, *Anchor Cleaning Service, Inc.*, 22 T.C. 1029 (1954) ; and contracts of checking account system customers, *Thrifticheck Service Corporation, supra.*

Petitioner has shown us nothing to indicate that the contracts here in issue were not a collective, single asset. In fact, the record is most persuasive that they were. We note, *inter alia*, that the 1947 sales agreement identified its subject matter as "the contract medical practice"; it provided an option for termination in vendor if the "membership" (the original 8,984 contracts *plus contracts thereafter acquired*) fell below 50 percent of the membership transferred, and it refers to this right as an "option to re-acquire and repossess the said practice." [4] The sales agreement nowhere attempts to value individual contracts or treat them as separate units and in its attached "Exhibit C" it provides for dissolution payments to members of vendee partnership based, not upon number of contracts, but upon "an amount equal to the share of the net income of the business for the year of such [event of dissolution] and for each of the two fiscal years next thereafter ensuing."

We note further that neither of the vendee partnerships capitalized the cost of obtaining the contracts acquired after August 1, 1947, the effective date of the sales agreement. Further, Callison, in testifying as to how the purchase price was arrived at, stated :

A. It was arrived at by bargaining. The bargaining was carried on between Dr. Gorham and myself. He had full access to and made use of the privilege of examining all of the records, the accounting records and so forth, for many years previous to that time, in order to familiarize himself with the profit, if any, and the income and what it was, consisted of, and after he had examined the records and all, we arrived at this amount by, purely by bargaining. *It was not based on any particular amount per member or for any particular thing* and it included the elements which I believe are set forth in the agreement. [Emphasis supplied.]

Q. * * *

Now, the parties have stipulated that out of this $255,000.00, some $2300.00 was agreed between the parties to be the purchase price for the furniture and fixtures. That is part of the stipulation.

---

[4] Callison, the vendor, had guaranteed a debt obligation of the vendee partnership and the sales agreement provided certain security arrangements to him.

Now, as to the remainder of the purchase price, was there any agreement between the purchasers and yourself as to the amount that would be applicable to the purchase of 9,000 individual contracts?

A. No, sir. It's my recollection that it was a lump sum, over-all amount for the organization, consisting of all of these various elements but I have no recollection that there is any stipulated amount allocated to any particular element.

Q. During negotiations, there was no amount allocated to any particular element, is that correct?

A. No, that's quite correct.

On this record we feel that our decision in *Thrifticheck* is controlling. In that case we said:

It is clear from the evidence in the instant case that it was the intention of both parties to the transaction that the petitioner should acquire and continue the going business of Bankers and that this was done. An important, if not the most important, asset of Bankers was its customer structure, represented by the 200 contracts in question. While in the contract of purchase the contracts were listed by names of customers, no specific price was set forth for the individual contracts. Rather, the sum of $290,818.61 was paid for the aggregate of such contracts. While in negotiations leading up to the fixing of the price to be paid, each party to the transaction did take into consideration the remaining unexpired term of each contract and the estimated income which might be expected over such remaining term, this does not establish that individual contracts were purchased. Nor in our opinion is it determinative that the petitioner entered the contracts on its books at fixed costs and amortized such costs.

The instant case presents a strikingly similar picture. Indeed, the identity of the 8,984 members was unknown to petitioner, and the expected life of each contract was extremely uncertain and doubtless largely dependent on the quality of service rendered. Without deciding what, if any, part of the purchase price of the entire organization was attributable to goodwill, we conclude that the acquisition of these contracts constituted the acquisition of but one intangible capital asset which is not exhausted by the passage of time alone, but has such a characteristic of continuing value and useful life that it cannot bear amortization.

We conclude that the aggregate of these contracts would not be exhausted until the medical service organization became worthless or was disposed of. *Thrifticheck Service Corporation, supra.*

Our disposition of this issue renders unnecessary an allocation of the purchase price into its various constituent elements, and we reject petitioner's argument that he was misled as to the principal issue in this case by the language of the statutory notice of deficiency. The separate paragraph of such notice which reads: "Income has therefore been increased by $16,552.90 representing the disallowance of membership write-off as a capital expenditure and not an allowable deduction." is not capable of misinterpretation in our opinion.

Because of stipulated concessions and petitioner's concession that Callison's covenant not to compete was worthless,

*Decision will be entered under Rule 50.*