**SUNSET FUEL CO., an Oregon Corporation, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 74–2203.

United States Court of Appeals, Ninth Circuit.

June 30, 1975.

Dennis M. Donohue, Atty. (argued), Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant-appellant.

Morris J. Galen (argued), Portland, Ore., for plaintiff-appellee.

## OPINION

Before KOELSCH and CARTER, Circuit Judges, and SCHNACKE,* District Judge.

KOELSCH, Circuit Judge:

The government appeals from a judgment of the district court granting the Taxpayer's claim for a refund disallowed by the Commissioner.

The validity of the loss deduction, 26 U.S.C. § 165, upon which the claimed refund is based, turns upon the following facts:[1]

Taxpayer, a distributor of fuel oil, entered into an agreement with another local distributor of fuel oil, Dwyer, giving Taxpayer an option, insofar as here relevant, to purchase the names of Dwyer's fuel oil customers for $58,920. The option recites:

"The price for each customer on said customer list is an amount equal to 4¢ for each gallon of fuel oil purchased by such customer during the twelve-month period ended October 31, 1966 . . . . The actual gallonage of fuel oil sold during the twelve-month period ended October 31, 1966 without adjustment for appropriate degree days was 1,372,000."

Taxpayer exercised the option and received in return the list of Dwyer's customers (some 1,778 names). Taxpayer thereafter solicited Dwyer's customers, who had terminable-at-will delivery arrangements, and succeeded in obtaining the fuel oil business of many.

However, a number of Dwyer's customers did not commence or discontinued doing business with Taxpayer. In the three months between the purchase of the list and the close of Taxpayer's fiscal year, 523 list customers discontinued ordering; the following year another 268 former Dwyer customers followed suit. Taxpayer claimed the portion of the price paid Dwyer for the list allocable to those lost customers as a loss deduction on its respective tax returns for those two years. The amount of each deduction was determined by the same formula used to determine the list's purchase price: the gallonage purchased by each of the discontinuing customers in the year prior to sale was multiplied by 4 cents and added up, the sum ostensibly representing the total loss suffered by Taxpayer on account of the discontinuance of those customers.

Taxpayer paid the tax assessed after disallowance of the deductions and filed a claim for refund. When the Commissioner disallowed the claim, it filed suit in the district court for refund. The dis-

---

* The Honorable Robert H. Schnacke, United States District Judge for the Northern District of California, sitting by designation.

1. The facts are detailed here only insofar as necessary to understand our disposition. A

fuller elaboration of the facts is set out in the district court's opinion, reported at *Sunset Fuel Oil Co. v. United States*, 1974–1 U.S.T.C. ¶ 9422 (D.Ore.1974).

trict court held Taxpayer was entitled to the loss deductions. We disagree.

The Commissioner's position is that Taxpayer's purchase of the customer list was the purchase of a single, "indivisible," capital asset; that termination of individual accounts merely marks a diminution in the value of the larger asset; and that such diminution is not allowable as a loss because it fails to satisfy the requirement that a loss be "evidenced by closed and completed transactions, fixed by identifiable events. . . . " Treas.Reg. § 1.165–1(b). That such is the general rule ordinarily applied to intangible "mass assets" is indisputable. *See Tomlinson v. Commissioner,* 507 F.2d 723 (9th Cir. 1975); *Skilken v. Commissioner,* 420 F.2d 266 (6th Cir. 1969); *Golden State Towel and Linen Service, Ltd. v. United States,* 373 F.2d 938, 179 Ct.Cl. 300 (1967); *Boe v. Commissioner,* 307 F.2d 339 (9th Cir. 1962); *Thrifticheck Service Corp. v. Commissioner,* 33 T.C. 1038 (1960), *aff'd,* 287 F.2d 1 (2d Cir. 1961); *Manhattan Co. of Virginia, Inc. v. Commissioner,* 50 T.C. 78 (1968); *Anchor Cleaning Service, Inc. v. Commissioner,* 22 T.C. 1029 (1954).

Two interrelated reasons dictate such treatment. First, ordinarily goodwill inheres in the mass, above and beyond the flow of additional income attributable to each particular terminable-at-will customer arrangement[2] comprising the components of the mass. In acquiring the customer list of a going business, the purchaser obtains a new level of operation in a market already opened by the seller, which will ordinarily be maintained in the normal operation of the expanded business at least partly through customer referrals, the return of customers who discontinue their orders and later resume doing business, and like elements of goodwill inherent in the customer structure.[3] When an account is lost, a ratable portion of the mass' goodwill, beyond the expected flow of income from that particular account, is not necessarily lost with it, as the lost customer may refer other customers to the business, and may later resume his orders. Thus, the "indivisible asset rule" prevents a deduction from being taken on goodwill which inheres in a customer structure as such and which is not lost when particular accounts are lost.

Second, the indivisible asset rule prevents a loss deduction when the nature of the purchased asset is such that individual accounts cannot be accurately valued. A taxpayer must be able to establish reasonably accurately a basis in the particular account on which the loss is claimed. Segregating out the goodwill is only the first step. The taxpayer must then prove the portion of the total purchase price allocable to the particular account lost. The cost of a particular account is a function of the flow of future income to be expected at the time of purchase because of the size of the sales to a particular account, discounted by the risk of discontinuance or nonpayment of that particular account existing at the time of purchase—a risk peculiar to each account depending on the nature of the customer and his future plans and prospects. Application of the indivisible asset rule reflects the fact that, when a relatively fungible mass of

2. In fact, such terminable-at-will intangibles are essentially goodwill themselves. They give the business possessing them the opportunity and expectation of future patronage—and hence a stream of income, the discounted value of which measures the value of the intangible purchased—which we recognized in *Boe* is essentially the nature of goodwill. 307 F.2d at 343. Presumably one aspect of goodwill may be divided from the other, however, and a loss taken on the immediate loss of expected income suffered.

3. Aside from the effects of such component elements of goodwill, the efforts of the buyer in soliciting business and the like may be necessary to maintain the expanded level of operations acquired in the purchase. Such expenses are deductible as ordinary expenses against current income, however; and thus, viewing the structure initially purchased as the same capital asset which is later sold does not prejudice taxpayer, avoids the difficulty of determining which portion of current expenses must be capitalized, and prevents the improper transformation of ordinary income into capital gains.

accounts is purchased, the taxpayer cannot determine the value of each account and establish a basis in it, but rather determines the value of the whole using some rule of thumb technique which discounts the income to be expected from the whole by the risk of discontinuance experience has indicated inheres in the mass as a whole (thereby averaging out the unique and indeterminable risks of each account).[4]

■ However, when a taxpayer is able both to segregate the goodwill from the other elements of value, and accurately to establish the cost of a particular account lost, a deduction will be allowed, as in *Commissioner v. Seaboard Finance Corp.,* 367 F.2d 646 (9th Cir. 1966). There, the Tax Court had held that 30 per cent of the purchase price of a mass of loan accounts was attributable to goodwill, and 70 per cent to other elements of value. The Commissioner did not challenge that finding of fact.[5] Giv-

en that failure, and the fact that each contract was individually valued when purchased,[6] we held the indivisible asset rule inapplicable. Taxpayer, here, contends it comes within the so-called "individual valuation" exception to the indivisible asset rule.

■ The district court so found. It had no problem in segregating the goodwill inhering in the indivisible mass from the value of the individual accounts, because it found that Taxpayer received no goodwill or "ongoing business" value when it purchased the list of customers. The court also found that Taxpayer and Dwyer had individually priced each customer on the list, and thus that Taxpayer had adequately established the cost of the particular customers lost. We have serious reservations about the court's first finding.[7] However, we are clear that the latter finding, that the accounts were "individually valued" within the meaning of *Seaboard Finance,* is clearly erroneous and requires reversal.

4. The inability to establish a cost basis for particular accounts lost does not necessarily prevent a taxpayer from charging a truly wasting "indivisible asset" off against the income it currently generates, because the taxpayer can show that the mass as a whole has a limited useful life and depreciate it.

5. Had the Commissioner challenged that factual finding, the result might have been different, as there is no apparent basis for the Tax Court's allocation between goodwill and other elements of value. The rationale of the indivisible asset rule insofar as it operates to prevent speculative deductions for non-wasting goodwill appears to have been entirely applicable.

6. The court in *Seaboard* seized upon individual valuation in distinguishing *Boe,* 367 F.2d at 652–653, where we indicated that individual valuation might have made a loss deduction proper. 307 F.2d at 343–344. The fact was somewhat irrelevant in *Seaboard,* however, as there the taxpayer sought to depreciate the indivisible mass rather than to take a loss deduction, and thus had no need to establish the cost of particular accounts. Of course, the fact that the price of individual accounts was separately negotiated might be relevant to determining whether the indivisible mass contains goodwill, segregating it, and hence determining the wasting portion which can properly be depreciated; in *Seaboard* that issue was

resolved by the Commissioner's failure to challenge the Tax Court's factual allocation, and the court's reliance on the fact of individual valuation was unnecessary.

7. The court appears to have based that finding on the fact that the customers acquired were in the same area as those already serviced by Taxpayer's going operation. That fact is not at all dispositive—an expanded level of operations and inroads into new markets can be purchased by obtaining the names of customers within the area served by the Taxpayer's existing business as well as by geographical expansion. In either event the Taxpayer may acquire the expectation of patronage from customers previously not served, and in the aggregate a level of operations previously not enjoyed. Rather, the ultimate question to be answered is whether the expanded level of operations will be maintained in the ordinary operation of the business by customer references, solicitation of names on the list, the return of discontinued customers, and the like. If so, the list should be treated as a single capital asset. Here, the evidence was somewhat conflicting. There was evidence that customer references were not a source of business. On the other hand, there was also an indication that a discontinued customer's name would still be of value to the acquiring business because it could solicit the confidential lead.

That finding rests on the recitation in the option agreement that the price of each customer on the list is equal to the product obtained by multiplying the gallonage purchased by that account by 4 cents, the sum of all the products constituting the aggregate price of the list. That recitation is somewhat ambiguous and misleading (and reveals the hand of the tax planner rather than the economic realities of the purchase). It may be read to state either that the parties actually negotiated with respect to each account, or that they agreed on the price of the mass and allocated such portion of the total price to each account after the fact. It is of course irrelevant, the distributive principle tells us, whether Taxpayer and Dwyer multiplied 4 cents by the gallonage account by account and then summed the products, or added up the gallonage first and multiplied by 4 cents. The agreed purchase price of the whole would in either case be the same; in the former, the fiction that a purchase price had been set for each account would be preserved.

Despite findings to the contrary by the district court, it strongly appears from the record that the parties engaged in the latter process. The option agreement itself does not break down the total price of the list into the prices of individual accounts; it recites the total gallonage of the customer list. The option makes no provision for adjustment of the purchase price in the event that some of the accounts discontinued during the option period. Taxpayer's president testified that losses would presumably be offset by new customers, strongly indicating that total gallonage was negotiated for, and that Taxpayer was indifferent to the identity of the individual accounts.

Moreover, it appears that the customer list was not shown to Taxpayer until the closing, in order to preserve the confidentiality of the names should the deal fall through. That being the case, the parties could not have agreed on a separate price for each named customer, and it is highly improbable that they negotiated on the basis of accounts' individual gallonages.[8] It appears far more likely that the seller informed Taxpayer of the total gallonage of the customer list, that they negotiated a sales price based on that gallonage, and that Dwyer accommodated Taxpayer in including a formula by which the total sales price could be allocated to individual accounts. Thus, contrary to the district court's findings, it appears the price was negotiated with respect to the whole as a single capital asset.

■ Regardless of which bargaining method was employed, however, the formula used was designed to value the aggregate, and was inadequate to value individual accounts. Substance, not form, controls. Taxpayer may not rely on a formula for allocating a cost to particular accounts if the formula is arbitrary and fails realistically to value individual accounts lost. Here, multiplying the prior year's sales by 4 cents provides an accurate estimate of the flow of future income which can be expected from the mass as a whole, because the 4 cent figure relates past sales to future income and incorporates a discount attributable to the risk of discontinuation or nonpayment taken over the mass as a whole. The figure is empirically determined from industry experience; it averages out the peculiarities of particular accounts.

However, multiplying individual gallonage by 4 cents may grossly understate or overstate the flow of income which in fact may be expected from that particular account when purchased. For instance, regardless of the size of prior

8. It is conceivable that the seller provided Taxpayer a list of the individual gallonages represented by each separate account, with names deleted, during the negotiations. However, there is no evidence to that effect in the record, and it seems unlikely that the parties would have engaged in that charade and not attached the list to the option.

sales, an account is worthless if it appears that the customer intends immediately to quit purchasing fuel oil; a purchaser would not pay anything for the name.[9] To appraise individual terminable-at-will accounts, a purchaser needs to know both the magnitude of future sales (which is a function of prior purchases), and the customer's credit standing and future plans. Thus, in *Seaboard Finance,* the taxpayer went through each account evaluating it on the basis of credit standing, age, nature and length of employment, size of family, payment record, and the like, in order to determine the risk of nonpayment of the individual contract and the prospect that the account would generate future loan business. 367 F.2d at 648–649. That Taxpayer, here, could not possibly have determined the price paid for the accounts here in that manner is made manifest by the fact that it did not receive the customers' names until after the closing.

The technique used here to assign a value to the accounts is in fact indistinguishable from the method we recently rejected in *Tomlinson, supra,* at 725, or the similar methods other courts have uniformly rejected. *E. g., Skilken, supra,* at 270; *Golden State, supra,* at 941–942; *Anchor Cleaning, supra.* Consequently, no loss deduction is allowable.[10]

The judgment is reversed, and the cause is remanded for entry of judgment for the United States.

**9.** Thus here, it appears that a large number of the discontinuations immediately after the purchase resulted from the fact that the customers wished to continue to purchase the brand of oil sold by the previous distributor, rather than that sold by Taxpayer. That fact was of course predictable. Taxpayer knew that some of the accounts it was purchasing were worth nothing to it because they would not do business with it; it simply assumed that the 4 cent figure would provide an accurate valuation of the whole based on the income of those customers who would not discontinue. Allowing Taxpayer a proportional loss deduction on the customers who immediately terminated is thus contrary to the economic reality that it retains the customers upon whom the sale price of the mass was predicated.

**10.** The district court opinion suggested that as an alternative basis for its decision the loss was allowable as a depreciation deduction. A depreciation deduction and a loss deduction are two different things, of course, and Taxpayer did not, as he must, introduce any evidence to establish the useful life of the list. In any event, no depreciation deduction is allowable in this case, as Taxpayer concedes, because it failed to raise the ground in its administrative claim for refund. Treas.Reg. § 301.-6402–2(b)(1). *United States Felt & Tarrant Manufacturing Co.,* 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025 (1939); *Ladd v. Riddell,* 309 F.2d 51 (9th Cir. 1962).