T.C. Memo. 2021-6

UNITED STATES TAX COURT

AARON G. FILLER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23581-17.                      Filed January 13, 2021.

Aaron G. Filler, pro se.

<u>Kathleen A. Dombrowski</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, <u>Judge</u>:  For petitioner Aaron Filler's 2014 tax year,
respondent determined a $611,367 deficiency in Federal income tax and a penalty
of $122,273 under section 6662(a).[1]

_____

[1]Unless otherwise noted, all section references are to the Internal Revenue
(continued...)

**[\*2]** The four issues remaining for decision for tax year 2014 after concessions[2] are whether Dr. Filler: (1) properly reported $100,000 of income received as capital gain rather than ordinary income, (2) is liable for self-employment tax, (3) is entitled to deduct a net operating loss (NOL) carryover originating in tax year 2012, and (4) is liable for a penalty under section 6662(a). We find for respondent on all issues.

## FINDINGS OF FACT

Some facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. Dr. Filler resided in California when he timely filed his petition.

## I. Dr. Filler's Educational Background and Licenses

Dr. Filler holds a medical degree from the University of Chicago, a Ph.D. from Harvard University, and a law degree from Concord Law School, Kaplan

---

[1](...continued)
Code (Code) in effect at the relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[2]Dr. Filler conceded the disallowance of the $25,000 rental loss deduction claimed on his 2014 return, as he stipulated that he did not have rental property in 2014. He also briefed the Court on allowing his 2014 home office deduction; however, respondent did not challenge the home office deduction in the notice of deficiency or otherwise.

[*3] University. Dr. Filler started his medical career in the United Kingdom (U.K.) working for St. George's Hospital Medical School (St. George's) in London. He then moved to the United States and completed his neurosurgical residency at the University of Washington (UW), Seattle, Washington, from 1986 to 1994. Dr. Filler was licensed in Washington State as a physician and surgeon from 1988 to 2006, and he has been licensed in California as a physician and surgeon since 1995 and is a board-certified neurosurgeon. He has also been licensed as a Fluoroscopy Supervisor and Operator in California since 1998 and has held various medical and surgical licenses in 10 other States since the early 2000s.

## II.    Dr. Filler's Professional Background

Dr. Filler had several academic and faculty positions and privileges at various universities and medical centers. He held positions at St. George's as a visiting research fellow from 1990 to 1991 and was a clinical lecturer of neuroimaging from 1991 to 1992.[3] Dr. Filler then held positions at UW from 1992 to 2001 as an instructor and/or professor involving subjects such as neuroimaging, neurological surgery, and neuroscience. From 1995 to 2001 (concurrently with his

---

[3]He also returned to St. George's as a Wellcome Trust Lecturer in the division of clinical neuroscience and biochemistry from 1994 to 1995.

**[\*4]** work at UW) Dr. Filler worked at the University of California Los Angeles (UCLA) in various capacities, including as clinical instructor, assistant professor, codirector, director, associate, and faculty member, involving areas such as interventional magnetic resonance imaging (MRI) and peripheral nerve and spine neurological surgery.

III.    Dr. Filler's Patented Inventions

Throughout his career, Dr. Filler used his skills to develop and patent technology.  Dr. Filler is listed as an inventor on 11 patents that were granted in the United States, Europe, and/or Japan from 1996 through 2006.  As of December 2014 Dr. Filler was also listed as an inventor on two additional patent applications pending in the United States.  He has written numerous articles and books, including chapters of academic books, and presented and lectured on subjects such as surgery, neurology, and medical imaging, including the technology he created.

IV.    Dr. Filler's Legal Career and Business Enterprises

Dr. Filler was admitted to practice law in the State of California in 2015, and he runs his own legal practice through Tensor Law, PC.  Dr. Filler also organized, owned, and/or provided services to the following relevant corporations:

| [*5] Abbreviation | Name of business |
|---|---|
| NG, Inc. or NGFX | NeuroGrafix, Inc. |
| INM | Institute for Nerve Medicine Medical Associates, Inc. |
| IBSC | Image-Based Surgicenter Corporation |
| NIMA | Neurography Institute Medical Associates, Inc. |
| CASN | Center for Advanced Spinal Neurosurgery Medical Group, Inc. |

Dr. Filler likewise operated several sole proprietorships. The relevant sole proprietorship is NeuroGrafix (NGSP), through which he provided services as a corporate promoter. Specifically, he promoted the formation of a new California corporation, similarly named NeuroGrafix, Inc. (NG, Inc. or NGFX), discussed infra pp. 7-13.

V. The 360 Patent and Relevant License Transfers

During the 1990s Dr. Filler in conjunction with colleagues developed an MRI technology that is now called Image Neurography and Diffusion Anisotropy Imaging. Dr. Filler began developing that new MRI technology in 1991 while working at St. George's. He filed a preliminary patent application in the U.K. on the technology before returning to the United States. St. George's did not participate in the U.K. patent. Upon his return to the United States and while

[*6] working for UW, Dr. Filler, Jay Tsuruda, Todd Richards, and Franklyn Howe (inventors) further developed the MRI technology covered by the U.K. patent.

On or about March 8, 1993, the inventors filed with the U.S. Patent and Trademark Office (USPTO) Application Serial No. 28,795 to patent the MRI technology. The technology was described in the application as capable of generating three-dimensional images by using a "neurography system" that selectively images neural tissue. Specifically, the inventors developed unique apparatuses and methods and used a magnetic resonance scanner to selectively isolate neural tissue by making a person's bone, fat, skin, muscle, blood, and connective tissue disappear from the image. This technology was developed to be used as a part of a broader medical system by assisting in the proper administration of other systems, such as auxiliary data collection and diagnostic, therapeutic, training, and surgical systems.

While the Serial No. 28,795 patent application was pending before the USPTO, there was a series of transfers of the rights to the MRI technology represented by the patent application. On or about June 14, 1993, the inventors assigned the technology to UW, making UW the owner of it and any resultant patent. By a licensing agreement effective March 23, 1994, UW granted Washington Research Foundation (WRF) an exclusive license in the MRI

[*7] technology in exchange for 60% of gross proceeds received by WRF in sublicensing the technology protected by the patent, once received.

The patent application for the aforementioned MRI technology was ultimately granted by the USPTO on October 1, 1996, resulting in the issuance of Patent No. 5,560,360 (360 patent).[4]

VI.    The Incorporation of NG, Inc.

In an effort to develop a neurography imaging business and provide financial incentives for the use of the 360 patent licensed by WRF, Dr. Filler and others formed a new corporation to license the patented technology from WRF.

Thus, on or about December 26, 1997, Dr. Filler and others signed a document titled "Pre-Incorporation Agreement for NeuroGrafix, Inc." (preincorporation agreement), which provided for the organization of a new legal entity, NG, Inc.  Upon formation NG, Inc. was expected to issue 100,000 shares in its first round of equity funding.  Dr. Filler would receive 75,000 shares (75% of NG, Inc.'s stock) in exchange for his preformation activities (done through his sole proprietorship, NGSP).  Those preformation activities included amounts expended for legal, consulting, travel, and business development by NGSP and the

---

[4]A copy of the 360 patent filed with the USPTO is included in the record as Exhibit 29-J.

**[*8]** future expenses related to legal arrangements associated with the incorporation of NG, Inc. Further, the pre-incorporation agreement provided:

> Dr. Filler will complete negotiations with the Washington Research Foundation to secure a license for the two patents and improvements to himself personally. This license will stipulate that he will transfer the license in its entirety to NeuroGrafix Inc[.]

> Once the license is secured by Dr. Filler and all pertinent parties are in agreement as outlined in this document, the following transaction will take place. Dr. Filler will assign the license to NeuroGrafix, Inc in exchange for an ongoing consideration to be paid to him as a royalty. It is intended that this method of payment to Dr. Filler will be carried out in place of any compensation for managerial or professional services as long as he remains bound by the terms of the UCLA Compensation Plan. This arrangement may be altered upon vote of the shareholders if his obligations under that Plan change or otherwise cease to apply.

The key patent referenced above is the 360 patent and is the only patent referenced herein.

The remaining 25,000 shares in NG, Inc. would be issued after Dr. Filler arranged the transfer of the license in the 360 patent to NG, Inc. The ultimate share ownership in NG, Inc. is more fully described <u>infra</u> p. 11.

The negotiations for licensing the 360 patent from WRF went on for just under a year. On or about December 7, 1998, Dr. Filler sent the following letter to Beth Etscheid, WRF's Manager of Business Development:

[*9]      Thanks for your most recent draft of the License agreement [between WRF and NG, Inc.].  One additional issue discussed in the Pre-Incorporation Agreement relates to my status at UCLA.  In order to allow me to receive income from NeuroGrafix Inc. we obtained legal advice that a useful approach would be to have the rights assigned to me personally as * * * [NGSP] * * *, upon which I then assign the rights to NeuroGrafix Inc. in exchange for a royalty arrangement between myself and NeuroGrafix Inc.  In addition, this sequence of events helps justify the difference in share price between my own shares and those of the remaining shareholders as outlined in the Pre-Incorporation Agreement.

Because of tax considerations, we have chosen December 16th as the date to form NeuroGrafix Inc.  At this point, I am ready to sign the License agreement but the corporation is not yet formed.

I have enclosed a brief rider to the License Agreement which guarantees that any income generated or contracts signed by * * * [NGSP] will be transferred immediately and in their entirety to NeuroGrafix, Inc. as the successor to * * * [NGSP] as soon as that corporation is formed.

The described rider was a one-page, two-paragraph document that reads as follows in its entirety:

Supplemental Note to License Agreement

It is agreed that Aaron G. Filler will transfer all rights and interests covered in the attached License Agreement to NeuroGrafix Inc. immediately upon formation of that corporation.  This transfer will include any contracts, income or obligations under the agreement, or any other covered interests, debts or obligations.  The transfer will be in exchange for a consideration in royalties to be paid by NeuroGrafix Inc. to Aaron G. Filler, an individual under the terms of an agreement to be completed between them.

**[*10]**      This <u>interim assignment</u> to Aaron G. Filler and * * * [NGSP], followed by a transfer in no more than 14 days to NeuroGrafix Inc. is in accordance with paragraph 1.2 [of the draft licensing agreement between WRF and NG, Inc.] which indicates that the licensee [NG, Inc.] will be incorporated as described in the Pre-Incorporation Agreement of December 24, 1997. [Emphasis added.]

The document was signed by the president of WRF, Ronald Howell, on December 8, 1998 (WRF-Filler interim note). Dr. Filler paid no consideration for the WRF-Filler interim note.

On December 16, 1998, NG, Inc. was incorporated in California. After incorporation, on December 21, 1998, and in accordance with the WRF-Filler interim note, Dr. Filler, through NGSP, entered into a licensing agreement with NG, Inc. for the transfer of the 360 patent to NG, Inc. (Filler-NG, Inc. licensing agreement). The agreement provides that NG, Inc. will pay Dr. Filler an upfront license fee of 75,000 NG, Inc. common shares and royalties of 20% of NG, Inc.'s gross income, up to a maximum of $100,000 per year. The agreement severely restricts NGSP's rights, subordinating them to WRF's. Dr. Filler signed on behalf of both businesses, as "President" of each.

The NG, Inc. Incorporation Agreement (incorporation agreement), dated January 1, 1999, provided that the company would derive its profits from royalties and fees from licensing and sublicensing the 360 patent, fees from billing services,

[*11] lease revenue from leasing its telecommunications network and equipment, fees from managing clinical trials involving the 360 patent, and marketing and advertising on its web page.

As with the preincorporation agreement, the incorporation agreement provided for the issuance of 100,000 shares. Seventy-five thousand were issued to Dr. Filler. The remaining 25,000 shares in NG, Inc. were issued to other individuals and WRF. Of the individuals, Marvin Cooper, Dr. Tsuruda, and Dr. Grant Hieshima each received 5,000 shares and William and Harriet Filler each received 2,500 shares in exchange for preformation costs and/or services in establishing NG, Inc. Specifically, Dr. Tsuruda was issued his shares for developing the patent and for his ongoing consultative role in developing the technology and the current business plan. WRF received 5,000 shares, 4,000 shares in exchange for providing NG, Inc. an exclusive license to the 360 patent in the United States and Australia and the other 1,000 shares for an option agreement for use of the 360 patent in other territories.

In the incorporation agreement, the individual shareholders were assigned various roles in the company. Dr. Filler was the chief executive officer, president, secretary, and director of NG, Inc. He had overall responsibility for (1) initiating and following through with negotiations with potential partners and licensees and

[*12] (2) organizing and supervising the research and development, internet, and teleradiology aspects of the business together with the chief scientific officer (CSO). Dr. Tsuruda was the CSO, vice president, and director; Dr. Hieshima was the chief medical officer and director; Mr. Cooper was the chief financial officer, treasurer, and director; and William Filler was the chief research officer and director. Those officers had duties consistent with their titles.

For their roles, officers other than Dr. Filler were each to receive compensation of up to $100,000 per year, not to exceed 5% of NG, Inc.'s gross income. Dr. Filler was to receive 20% of NG, Inc.'s gross income, up to a maximum of $100,000 per year, which was labeled a royalty, for transferring the 360 patent to NG, Inc. in accordance with the WRF-Filler interim note.

Specifically, the incorporation agreement states as follows:

> The patent license [in the 360 patent and improvements in the United States and Australia] was then transferred in its entirety to NeuroGrafix Inc. by Dr. Filler from his sole proprietorship [NGSP] on December 21, 1998 in exchange for an ongoing consideration from the corporation to be paid to him as a royalty. It is intended that this method of payment to Dr. Filler will be carried out in place of any compensation for managerial or professional services as long as he remains bound by the terms of the UCLA Compensation Plan. This arrangement may be altered upon vote of the shareholders if his obligations under that Plan change or otherwise cease to apply.

[*13] Moreover, WRF was also paid for its transfer of the 360 patent to NG, Inc., and for that transfer the incorporation agreement includes detailed terms describing WRF's compensation. WRF would receive an upfront license fee and royalties in exchange for the license in the 360 patent. NG, Inc. was to issue WRF 4,000 shares, see supra p. 11, as an upfront license fee for the 360 patent. WRF would also be paid a royalty on sales by NG, Inc.[5] calculated as 1.5% of the first $2.5 million in net sales and 2.5% of net sales above $2.5 million in any semiannual reporting period with no limit on the maximum royalty payment. Additionally, WRF received a convertible note in the principal amount of $74,000, drawing interest at 10% per year, as reimbursement for its preincorporation patent expenses and an additional nonconvertible note issued to cover expenses greater than $74,000 that were incurred between negotiation and the time of signing the license agreement. The stipulated copy of the incorporation agreement was not signed by WRF.

VII.  License Agreement With WRF

While the incorporation agreement was not signed by WRF, the terms in that agreement were referenced in an exclusive license agreement executed between WRF and NG, Inc. which was effective on or about December 29, 1998

[5]Or a strategic partner such as NIMA.

**[*14]** (WRF-NG, Inc. licensing agreement). The license agreement solidified NG, Inc.'s ability to use and market the 360 patent. The WRF-NG, Inc. licensing agreement has no reference to the property rights Dr. Filler acquired via the WRF-Filler interim note. Rather, the agreement provides that the 360 patent "derived from research done at University of Washington and St. George's, and grant of right to WRF."

VIII. Other License Agreements

In June 2009 NG, Inc. signed a series of nearly identical exclusive license agreements as follows:

| Date of agreement | Licensor | Licensee |
|---|---|---|
| 6/1/09 | NG, Inc. | NIMA |
| 6/17/09 | NG, Inc. | INM |
| 6/17/09 | NG, Inc. | IBSC |
| 6/17/09 | NG, Inc. | CASN |

Each of the agreements defines NG, Inc. as "NeuroGrafix, Inc. ("NGFX")" and each has the following recital:

> NGFX is the exclusive licensee of the Washington Research Foundation ("NGFX") [sic[6]], of certain technology regarding Image Neurography, Diffusion Anisotropy Imaging, and Central Nervous System (CNS) Tractography with named inventors Aaron Filler,

---

[6]WRF was inadvertently abbreviated as "NGFX" rather than "WRF".

[*15] Franklyn Howe, Todd Richards and Jay Tsuruda ("Inventors"). This technology is covered by certain patent and know-how rights * * * [further defined in the agreement].

None of the 2009 agreements list Dr. Filler or NGSP as the licensor of the patents to NG, Inc., or refer to the WRF-Filler interim note. The NG, Inc. license with NIMA was amended on or about September 2011, reciting once more that NG, Inc. "is the exclusive licensee of the Washington Research Foundation ('WRF'), of certain technology." All agreements refer to the grant of the rights to the 360 patent from WRF to NG, Inc. mention that the 360 patent derived from research performed at UW and St. George's and describe the parties' limitations and rights in reference to UW and St. George's. However, there is no reference to the transfer of rights described in the WRF-Filler interim note or the Filler-NG, Inc. licensing agreement. Dr. Filler signed on behalf of both parties in each agreement.

Finally, in December 2013 there were several retroactive assignments involving UW, WRF, NG, Inc., and Dr. Filler as a result of certain later discussed patent infringement litigation. See infra pp. 23-24. In the retroactive assignments there is no reference to the rights described in the WRF-Filler interim note or the Filler-NG, Inc. licensing agreement. See infra pp. 23-24.

**[*16]** IX.    Patent Infringement and Inverse Condemnation Suits

From 2008 to 2012, NG, Inc. brought various lawsuits involving the 360 patent in various State and Federal courts.  One suit was before the California Superior Court against the State of California for inverse condemnation, and about 19 other cases were brought in various U.S. District Courts and the U.S. Court of Federal Claims for patent infringement.  All suits related to the infringement of the 360 patent.  In fact, litigation was still pending at the time of trial.  As discussed below, the opposing parties in many of the suits challenged NG, Inc.'s standing to sue because the chain of title and/or the rights transferred in the 360 patent was unclear after WRF transferred its rights in the 360 patent in 1998.

NG, Inc., WRF, Dr. Filler and various businesses he owned settled several alleged infringement suits involving the 360 patent whereby NG, Inc. received settlement payments.  As of the time of trial in this case, NG, Inc.'s litigation settlements involving the 360 patent totaled $10,300,000.  The litigation settlements are summarized in the following table:

**[*17]**

| Date of settlement | Abbreviated litigation name | Settlement amount |
|---|---|---|
| 6/1/09 | Philips/Oak Tree | $900,000 |
| 11/21/11 | Siemens | 2,700,000 |
| 12/13/12 | UCLA/GE | 2,500,000 |
| 2/7/13 | Medtronic | 200,000 |
| 10/20/14 | Philips Consumer | 4,000,000 |
| Total | | $10,300,000 |

Below we discuss the three largest of these settlements as well as a case filed against the U.S. Government.[7]

A.    Siemens Litigation

On March 18, 2010, NG, Inc. and various businesses Dr. Filler owned sued Siemens Medical Solutions USA, Inc., and Siemens Aktiengesellschaft

---

[7]As to the Philips/Oak Tree and the Medtronic settlements, we simply note as follows:  On or about June 2009 WRF, NG, Inc., and Dr. Filler, individually and as a representative of businesses he owned, settled a patent infringement lawsuit against Oak Tree Medical Corp. and Oak Tree ASC, LLC, Dr. Tsuruda, and Philips Electronics North America Corp. by agreeing to pay nonexclusive license fees for the 360 patent to NG, Inc. on an installment basis.  See NeuroGrafix v. Oak Tree Med. Corp., No. 2:08-CV-02923 (CAS JTLx) (C.D. Cal. filed May 5, 2008) (dismissed with prejudice on or about June 30, 2009).  On or about February 7, 2013, NG, Inc., WRF, and Dr. Filler as an individual and as representative of various businesses he owned signed a settlement agreement with Medtronic Navigation, Inc., and Medtronic, Inc.  See NeuroGrafix v. Medtronic Navigation, Inc., Case No. 12-CV-02977-WYD-MJW (D. Colo. filed Nov. 13, 2012) (dismissed with prejudice on or about February 26, 2013).

[*18] (collectively Siemens) in the U.S. District Court for the Central District of California alleging patent infringement of the 360 patent. NeuroGrafix v. Siemens Med. Sols. USA, Inc. (Siemens I), No. 2:10-CV-01990 MRP (RZX) (C.D. Cal. filed March 18, 2010). Siemens counterclaimed, alleging noninfringement, invalidity, and unenforceability. On June 30, 2010, the District Court found that the WRF-NG, Inc. licensing agreement did not convey all substantial rights in the 360 patent such that NG, Inc. did not have standing to sue for infringement without joining WRF to the suit. The District Court dismissed Siemens I without prejudice as to NG, Inc. so that it could join WRF but dismissed with prejudice as to all the other plaintiffs in that lawsuit. On July 30, 2010, NG, Inc. filed an amended complaint naming it and WRF as plaintiffs (Siemens II).

In November 2011 Siemens II settled.[8] The plaintiffs for purposes of this settlement agreement are WRF, NG, Inc., various other businesses Dr. Filler owned, and Dr. Filler individually and as president or designated representative of NG, Inc. and his other businesses. Siemens denied that it "directly or indirectly infringed any claim of the []360 patent either literally or under the doctrine of equivalents" and asserted that it had defenses against such claims, "including,

---

[8]The joint stipulation to dismiss the case was filed by the parties with the District Court on November 22, 2011, and an order dismissing the case with prejudice was entered on the same date.

[*19] without limitation, that the []360 patent is invalid and/or unenforceable." To settle the matter, Siemens paid NG, Inc. $2.7 million for a nonexclusive license under the 360 patent.

B.    UCLA/GE Litigation

On or about October 15, 2010, NG, Inc. and various businesses Dr. Filler owned sued the Regents of the University of California (Regents), UCLA's governing body, and UCLA in the California Superior Court for inverse condemnation, trespass, and conversion for the alleged infringement of the 360 patent. NeuroGrafix v. Regents of the Univ. of Cal., No. BC 447518 (Cal. Super. Ct. filed Oct. 15, 2010). On May 17, 2011, the case was voluntarily dismissed when UCLA waived sovereign immunity and agreed to be sued in Federal court for infringement of the 360 patent. On or about September 14, 2011, a new case was filed in the District Court against Regents by NG, Inc., WRF, and various businesses Dr. Filler owned. NeuroGrafix v. Regents of the Univ. of Cal., No. 2:11-CV-7591 MRP (Rzx) (C.D. Cal. filed Sept. 14, 2011). General Electric Co. (GE) intervened in the second case because it manufactured the products that were used by UCLA that allegedly infringed on the 360 patent (UCLA/GE case). Id.; see also Gen. Elec. Co. v. NeuroGrafix, No. 2:12-CV-4586 MRP (Rzx) (C.D. Cal.

**[*20]** filed May 25, 2012) (WRF, NG, Inc., NIMA, and IBSC are defendants and counterclaimants).

On or about December 13, 2012, the UCLA/GE case settled (UCLA/GE settlement agreement). The "plaintiffs" as defined in the settlement agreement were NG, Inc., WRF, various other businesses Dr. Filler owned, and Dr. Filler individually and as president or designated representative of NG, Inc. and his other various businesses. The "defendants" were GE and the Regents, who denied "that they have directly or indirectly infringed any claim of the []360 patent either literally or under the doctrine of equivalents" and asserted that they had defenses against such claims, "including, without limitation, that the []360 patent is invalid and/or unenforceable." Accordingly, the settlement agreement contains no admission of patent infringement. Dr. Filler also covenanted not to sue GE and Regents.

Pursuant to the settlement terms, GE paid NG, Inc. $2.5 million for a nonexclusive license of the 360 patent. Specifically, the UCLA/GE settlement agreement provides:

> In consideration for the release granted in Section 3 [mutual releases by plaintiffs to GE and Regents, and respective release to them by the plaintiffs], the license granted in Section 4 of this Agreement [GE was granted a nonexclusive license in the 360 patent], and the covenants granted in Section 5 [plaintiffs covenant

[*21] not to sue either Regents or GE], the sufficiency of which is hereby acknowledged by the Parties, GE shall pay to * * * [NG, Inc.] the non-refundable sum of two million five hundred thousand U.S. dollars ($2,500,000.00, the "Settlement Payment"), which will constitute full and complete satisfaction of any and all payment obligations of GE to Plaintiffs.

On or about December 14, 2012, the parties to the UCLA/GE case agreed to dismissal with prejudice of "all claims and counterclaims in this action," and the motion was signed, through their respective counsel, by NG, Inc., WRF, other businesses Dr. Filler owned, GE, and Regents. On or about December 17, 2012, the UCLA/GE case was dismissed with prejudice pursuant to a joint stipulation of the parties.

C.   U.S. Litigation

On June 15, 2012, NG, Inc. and IBSC sued the U.S. Government in the Court of Federal Claims for patent infringement (U.S. case). NeuroGrafix v. United States, No. 1:12 CV 385 (Fed. Cl. filed June 15, 2012). The United States moved to dismiss for lack of jurisdiction on grounds that the plaintiffs lacked standing. To decide the motion, the Court of Federal Claims requested and received all potentially relevant documents regarding the relationship between NG, Inc., UW, and WRF, including all assignments, licenses, and related agreements.

[*22] On June 7, 2013, the Court of Federal Claims decided that NG, Inc. did not have standing to sue without WRF and dismissed the case without prejudice. NeuroGrafix v. United States, 111 Fed. Cl. 501, 506, 508 (2013) ("Even if WRF holds substantially all the rights, the Court finds that the WRF-NG Agreement did not grant NG[, Inc.] the right to sue the United States.").

      D.     Multidistrict Litigation and the Philips Consumer Settlement

Between June and November 2012 NG, Inc. and various businesses related to Dr. Filler filed various suits for patent infringement of the 360 patent against Philips Electronics North American Corp. (Philips North) and a number of university hospitals that purchased technology from Philips North and its associated corporations[9] (Philips case). In April 2013 a multidistrict litigation (MDL) panel was formed in the District of Massachusetts to allow nine actions in four District Courts, the Philips case, and eight of the associated consumer cases to be consolidated into an MDL in the District of Massachusetts (MDL cases). In Re: NeuroGrafix (360) Patent Litigation, No. 1:13-MD-02432-RGS (D. Mass. March 24, 2014). The court also considered whether the U.S. case, which was still pending before the Court of Federal Claims, should be consolidated. In ordering

---

[9]Invivo Corp., Philips Medical Systems Nederland B.V., Koninklijke Philips Electronics N.V., Philips Healthcare Informatics, Inc.

[*23] consolidation, the MDL court found that the governing statute, 28 U.S.C. sec. 1407, allows consolidation only of cases pending before District Courts; and because the U.S. case was filed in the Court of Federal Claims, it was not consolidated.

Because the defendants in the MDL cases challenged the plaintiffs' standing to sue, in December 2013 the following three relevant new patent assignment documents were signed: (1) UW assigned all patent rights including the right to sue for patent infringement to WRF; this assignment had the same effective date as the original assignment, March 23, 1994; (2) WRF assigned all its patent rights to NG, Inc. (making it the exclusive licensee), effective as to the original grant of the exclusive license, December 29, 1998, and assigned the exclusive right to sue for patent infringement effective June 4, 2012 (including infringements that occurred before the transfer); and (3) NG, Inc. assigned all patent rights to Dr. Filler, including the exclusive right to sue for patent infringement that occurred before the transfer, with an effective date of December 27, 2013.

Further, NG, Inc. and WRF drafted a second amended license agreement, which provided that the objective of the amendment was "to remove WRF as a necessary party to actions where Licensee [NG, Inc.] asserts the Patent Rights against Third Party infringers and related actions." The agreement was signed on

**[\*24]** or about December 27, 2013, by only Dr. Filler on behalf of NG, Inc. None of the four instruments mentions the WRF-Filler interim note nor the Filler-NG, Inc. licensing agreement, signed on or about December 8 and December 21, 1998, respectively. On March 24, 2014, the MDL court found that the revised assignments signed in December 2013 conferred standing on the plaintiffs to continue with the litigation.

On or about October 20, 2014, Dr. Filler, as an individual and as president or designated representative of NG, Inc., IBSC, and NIMA signed a settlement agreement to settle cases involving Philips (Philips consumer cases). Philips paid $4 million to NG, Inc. to settle the lawsuits involving infringement of the 360 patent against Philips and the majority of its consumers. By that time the patent had expired, and a license was no longer necessary.[10] In January 2015 the parties stipulated the dismissal of the case with prejudice, which was entered by the District Court shortly thereafter.

While the Philips consumer cases settled, new suits were subsequently filed by Dr. Filler and his businesses, which were consolidated under the same MDL

---

[10]The 360 patent expired as a matter of law on March 8, 2013. See 35 U.S.C. sec. 154(a)(1) and (2) (2012) (patent expires 20 years from the date of application).

[*25] case number referenced above. Most of the new MDL cases were closed by the time of trial in this case.

### E. No Patent Infringement or Inverse Condemnation of 360 Patent Found

Although litigation on the patent infringement claims was ongoing at the time of trial in this case, no State or Federal court had found infringement of the 360 patent. Also at the time of trial in this case, no court had found inverse condemnation for a government's infringement of the 360 patent.

## X. Dr. Filler's Tax Returns

For each of the years 2010 through 2013, Dr. Filler and his wife Annelise Shaw timely filed a joint Federal income tax return and subsequently amended each twice.

### A. Tax Years 2010-13: Original Returns and First Amended Returns

As to their original returns, the firm Parsi & Co., Certified Public Accounting (Parsi & Co., C.P.A.) prepared the couple's Forms 1040, U.S. Individual Income Tax Return, for tax years 2010 through 2012 (i.e., their original returns). Dr. Filler and his wife did not engage a return preparer for their Form 1040 for 2013 or any of their amended returns.

[*26] On or about March 21, 2014, Dr. Filler and Ms. Shaw filed their first Form 1040X, Amended U.S. Individual Income Tax Return, for 2011. That return reported in Part III, Explanation of changes, that "[t]he major changes are due to * * * capital gains treatment of purchase payments for a patent under §1231. These changes include appropriately showing the interest on late payments according to a 1998 agreement." The same explanation was provided on the first Forms 1040X for 2010 and 2012; although those returns were processed, they were unsigned and undated.

On or about January 5, 2015, for tax year 2013 Dr. Filler and his wife filed a Form 1040X to correct minor reporting and computational errors.

B. Second Forms 1040X

In or about March 2015 Dr. Filler and his wife submitted a second Form 1040X for 2012 reporting a $5,250,000 loss from theft or involuntary conversion of property used in his trade or business; this return was not processed by the Internal Revenue Service (IRS). Part III of that Form 1040X reports that the loss was based on the alleged inverse condemnation by the State of California[11] and the

---

[11]See supra pp. 19-21, discussing the UCLA/GE case and settlement.

[*27] United States[12] from their purported patent infringement of the 360 patent and concludes that "by free distribution, these governments caused severance damage to the business owner (Aaron Filler) of * * * [NG, Inc.] which became unsalable as a business because California and the United States were giving away * * * [NG, Inc.'s] products for free on a massive scale throughout the United States." Also indicated on the second amended return was that the loss was not previously reported on their 2012 Form 1040 or their first Form 1040X because entitlement to deduct the loss depended on the MDL court's March 24, 2014 decision. See supra p. 24.

The $5,250,000 loss was reported on Form 4797, Sales of Business Property. The property was described as "Neurografix val. Severance", and the date acquired was reported as January 1, 1999, and the date sold as December 13, 2012, when the UCLA/GE settlement agreement was executed. See supra p. 20.

The loss reported on this second amended Form 1040X for 2012 was described by Dr. Filler as follows:

> The value can be determined at its minimum because GE and Siemens--each representing 1/3 of the market for MRI scanners in the United States have together paid $4.5 million to * * * [NG, Inc.] for patent infringement damages with legal action now ongoing against Philips and expected to yield a larger amount. This provides firm

---

[12]See supra pp. 21-22, discussing the U.S. case.

[*28] evidence that a purchaser of * * * [NG, Inc.] would expect gross revenue of $7 million. Dr. Filler's 75% ownership position in * * * [NG, Inc.] is therefore a capital asset that has a measurable fair market value of $5,250,000. This value was a total loss as the company became unsalable due to aggressive inverse condemnation taking by the State of California.

Dr. Filler never had an appraisal of NG, Inc. or the 360 patent done, nor did he sell any of his NG, Inc. stock. He also had no basis in his NG, Inc. stock.

Overall, the starting point for the NOL that originated in 2012 was calculated by Dr. Filler as follows: (1) the adjusted gross income reported on his first amended Form 1040X for 2012 was $1,089,250; (2) that amount was subtracted from the $5,250,000 reported loss ($5,250,000 – $1,089,250 = $4,160,750); and (3) on the Form 1045, Application for Tentative Refund, Schedule A, NOL, for 2012 the $4,160,750 loss is reduced by $61,603 in nonbusiness deductions. The total NOL to be carried from 2012 was therefore $4,099,147.

On or about March 26, 2015, Dr. Filler and his wife also submitted second Forms 1040X for tax years 2010, 2011, and 2013 to carry the 2012 loss back to 2010 and 2011 and forward to 2013. The second Forms 1040X for 2010 through 2013 included Forms 1045, Schedule B, NOL Carryover, which reported the NOL carryback and carryover calculations from 2012 as follows:

| [*29] Year | Modified taxable income | NOL deduction | NOL carryover |
|---|---|---|---|
| 2010 | $890,370 | $4,099,147 | $3,208,777 |
| 2011 | 523,126 | 3,208,777 | 2,685,651 |
| 2013 | 736,038 | 2,685,651 | 1,949,613 |

C. The 2014 Return: The Year at Issue

On or about October 15, 2015, Dr. Filler and Ms. Shaw filed their joint Form 1040 for 2014, the year at issue. The 2014 return was prepared by Parsi & Co., C.P.A. The return reported the $100,000 Dr. Filler received from NG, Inc. as capital gain from an installment sale. Specifically, the couple reported $100,000 of income on Form 4797 and on Form 6252, Installment Sale Income. Further, Dr. Filler and Ms. Shaw claimed an NOL carryover deduction of $1,949,613 on their 2014 return from a loss reported as originating in 2012.

The IRS selected Dr. Filler and Ms. Shaw's 2014 return for examination. As part of that process, the examining agent prepared the Civil Penalty Approval Form for the 2014 accuracy-related penalty on March 8, 2016, and the immediate supervisor of the IRS examining agent signed the form on April 27, 2017, asserting the section 6662(a) penalty for a substantial understatement of income tax, and alternatively, for negligence. See sec. 6662(b)(1) and (2), (c), (d). That form states that the reason for the assertion of the penalty is either that (1) there

**[*30]** was a substantial understatement of income tax for 2014 "which exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000" or (2) Dr. Filler was negligent in his failure "to show there was a reasonable basis for claiming the disallowed NOL."

Having determined a deficiency, on August 23, 2017, pursuant to section 6212(a), the IRS sent Dr. Filler and his wife a statutory notice of deficiency (SNOD) for their 2014 tax year. Respondent challenged the $100,000 reported as capital gain from installment sale proceeds and the $1,949,613 claimed NOL carryover deduction that originated in 2012. The $100,000 was recharacterized as royalty income reportable on Schedule E, Supplemental Income and Loss, subject to self-employment tax. The NOL carryover deduction was disallowed for lack of substantiation. Finally, the IRS imposed an underpayment penalty under section 6662(a) and (b)(1) and (2) for a substantial understatement of income tax or negligence. Dr. Filler timely petitioned this Court.

OPINION

I.    Burden of Proof

In general, the Commissioner's determinations in a SNOD are presumed correct, and the taxpayer bears the burden of proving error. Rule 142(a); see INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering,

[*31] 290 U.S. 111, 115 (1933). Dr. Filler does not contend, and the evidence does not establish, that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact. Accordingly, Dr. Filler bears the burden of proof with respect to respondent's deficiency determinations. Respondent bears the burden of production, and Dr. Filler bears the burden of persuasion, with respect to the accuracy-related penalties under section 6662(a). See sec. 7491(c).

II.     Issue 1: Long-Term Capital Gain or Ordinary Income

The first issue before the Court is whether the $100,000 Dr. Filler received from NG, Inc. is taxable as ordinary income or as long-term capital gain subject to tax at the preferential rates set forth in section 1(h). Section 1235(a) provides that a transfer (other than by gift, inheritance, or devise) of all substantial rights to a patent by any holder shall be treated as the sale or exchange of a capital asset held for more than 1 year (i.e., long-term capital gain) regardless of the period the asset is held or whether the payments in consideration of the transfer are contingent upon the productivity, use, or disposition of the property transferred. Thus, for the transfer of a patent to qualify as a sale or exchange of a long-term capital asset under section 1235, the holder does not have to hold the asset for more than one year. See sec. 1235(a).

[*32] However, section 1235(a) does not apply if the transferee is a related person. Sec. 1235(d).[13] An individual shareholder and corporation are considered related persons if the individual owns 25% or more of the stock of the corporation directly or indirectly. Secs. 267(b)(2), (c), 1235(d). A "transfer by a person other than a holder or a transfer by a holder to a related person is not governed by section 1235." Sec. 1.1235-1(b), Income Tax Regs. Instead, the tax consequences of such transactions are determined under other provisions of the Code. Id.

Respondent argues that section 1235 does not apply to Dr. Filler's transfer of the exclusive license in the 360 patent to NG, Inc. because Dr. Filler had a 75% interest in NG, Inc. See secs. 267(b), 1235(d). Both parties agree that section 1.1235-1(b), Income Tax Regs., applies in that "other provisions of the Code" determine Dr. Filler's tax treatment. Although Dr. Filler agrees only in that NG, Inc. is technically a related transferee, he insists that capital gain treatment is warranted under section 1235. He explains that Congress enacted section 1235 to incentivize innovation by taxing proceeds from the transfer of inventors' rights in new technologies at the preferential capital gain rate. See S. Rept. No. 83-1622, at 439-440 (1954), 1954 U.S.C.C.A.N. 4621, 5083. Because of that, Dr. Filler

_____

[13]The subsections of sec. 1235 were redesignated effective December 19, 2014; sec. 1235(d) is now sec. 1235(c). See Tax Increase Prevention Act of 2014, Pub. L. No. 113-295, sec. 221(a)(82), 128 Stat. at 4049.

[*33] contends that sections 1221 and/or 1231 act as an exception to section 1235(d).[14]  Respondent contends that under the "other provisions of the Code" the remuneration is taxed as ordinary income because the label "royalties" is used in the incorporation agreement, and section 61(a)(6) provides that gross income includes royalties.

In their arguments before the Court, the parties respect the form of the 1998 agreements involving the 360 patent as a transfer of property, or at least some sticks in the proverbial "bundle of sticks," to and from Dr. Filler.  However, as described in the WRF-Filler interim note and the incorporation agreement, Dr. Filler negotiated the temporary transfer of the 360 patent to him, before the rights to the patent were transferred to NG, Inc., to avoid violating his compensation agreement with UCLA.  He paid no consideration for the temporary transfer to him.  For the next transfer of the 360 patent--to NG, Inc.--both WRF and Dr. Filler

---

[14]Specifically, Dr. Filler contends on brief that

> although royalties to a start-up business substantially owned by the inventor creates an issue with relatedness under section 1221, it was never the intention of Congress to penalize and inhibit the situation of an inventor creating a new technology and then organizing a startup company to develop a new business based on a new technology. Therefore, section 1235 capital gain reclassification is available through application of section 1231 (Quasi-Capital Assets) for this situation with inventors.

[*34] were compensated. The terms of WRF's compensation for the transfer to NG, Inc. were very specific and detailed. And although Dr. Filler's remuneration for the transfer of the 360 patent was labeled a royalty received for his transfer of the 360 patent to NG, Inc., the payment terms, $100,000 not to exceed 20% of NG, Inc.'s gross income, are similar to those of the other corporate officers for their services to NG, Inc. What is more, Dr. Filler had several responsibilities as defined in the incorporation agreement, and as it was written he received no compensation for those services.

Even more curious is that there is no mention of the two agreements--the WRF-Filler interim note or the Filler-NG, Inc. licensing agreement--in any subsequent agreement involving the transfer of the 360 patent, whereas some mention the parties' rights and limitations resulting from UW and St. George's rights or involvement in the development of the 360 patent. We point out these discrepancies, but tailor our analysis to the Code provisions cited by the parties and their legal arguments thereto.

Accordingly, we address first the applicability of section 1235 and then the other provisions of the Code cited by the parties. For the reasons stated below, we find the $100,000 of remuneration is ordinary income.

**[*35]** A.   Whether Dr. Filler's $100,000 Payment From NG, Inc. in 2014 Is Treated as Long-Term Capital Gain Under Section 1235

NG, Inc. was a "related person" at the time of the transfer. Under section 1235(d), capital gain treatment is not available under section 1235(a) if the transfer is made to a related person. As mentioned above, a shareholder and a corporation owned by that shareholder are considered related for section 1235 purposes if the shareholder owns, directly or indirectly, 25% or more in value of the outstanding stock of the corporation. Secs. 1235(d), 267(b)(2). Dr. Filler owned 75% of NG, Inc. when he transferred whatever rights he had in the 360 patent to NG, Inc. on December 21, 1998. Accordingly, NG, Inc. is a related person under section 267(b)(2), as modified by section 1235(d), and thus capital gain treatment under section 1235(a) is unavailable to him.

B.   Whether Dr. Filler's $100,000 Payment From NG, Inc. in 2014 Is Treated as Long-Term Capital Gain Under Other Provisions of the Code

When section 1235 does not apply to the transfer of rights in a patent, the character of the gain is determined under other provisions of the Code. Sec. 1.1235-(b), Income Tax Regs.; Rev. Rul. 69-482, 1969-2 C.B. 164; see also Cascade Designs, Inc. v. Commissioner, T.C. Memo. 2000-58, 2000 WL 204380, at *15-*16. We determine whether Dr. Filler is entitled to capital gain treatment

**[*36]** by addressing long-term capital gain treatment defined under section

1222(3) and long-term capital gain treatment allowed under section 1231.[15]

Section 1222(3) generally provides that gain from the sale or exchange of

capital assets held for more than one year will result in long-term capital gain.

First and foremost, to satisfy this provision the transferor must hold the asset for

one year or more. Sec. 1222(3). In the 1990s Dr. Filler gave up his rights in the

360 patent while the patent was pending. He explicitly acknowledged this in a

document he drafted and submitted to the Court.[16] Specifically, on June 14, 1993,

the inventors of the 360 patent assigned their rights to UW. In 1994 UW granted

an exclusive license in the 360 patent to WRF. Then from 1997 to 1998 Dr. Filler,

in the capacity of a corporate promoter on behalf of the NG, Inc., negotiated with

---

[15]We note that both Dr. Filler and respondent argue on brief that the Tax Cuts and Jobs Act of 2017 (TCJA), Pub. L. No. 115-97, sec. 13314, 131 Stat. at 2133, supports their positions. Respondent argues that the license in the 360 patent is not a capital asset because new sec. 1221(a)(3) specifically excludes patents from the definition of a capital asset. And although new sec. 1231(b)(1)(C) explicitly excludes patents from the definition of property used in a trade or business, Dr. Filler insists that he is entitled to capital gain treatment under sec. 1231 as "an inventor and grantee" of the 360 patent. Both parties are mistaken. The provisions added by the TCJA apply only to dispositions that occurred after December 31, 2017. The disposition at issue here occurred before that date.

[16]This admission was in Exhibit 28-P, which was admitted only for the limited purpose of showing Dr. Filler's state of mind.

**[\*37]** WRF for a transfer of an exclusive license in the 360 patent upon NG, Inc.'s incorporation. As of the beginning of December 1998, the WRF-NG, Inc. licensing agreement was nearly finalized.

But then on December 7, 1998, Dr. Filler requested an unnecessary additional step to the WRF-NG, Inc. licensing agreement to benefit him as an individual; he asked WRF to first transfer the exclusive license to the 360 patent to him because he thought that arrangement would afford him better tax treatment and would avoid his violating his UCLA compensation agreement. As an accommodation to Dr. Filler, WRF signed the WRF-Filler interim note on December 8, 1998. That agreement transferred rights in the 360 patent to Dr. Filler for only two weeks and was contingent on his subsequent transfer of those rights to NG, Inc. This accommodation transfer would not have been necessary if Dr. Filler had had an ownership right in the patent since the 1990s. Rather, that series of events shows that he had relinquished his rights to the patent in 1993 and he had no rights to it until December 1998, when he was granted some rights for only 14 days. Accordingly, Dr. Filler did not satisfy the holding period requirement. <u>See</u> sec. 1222(3).

We also find that Dr. Filler failed to prove he had a "sale or exchange." It is well established that the transfer by the owner of a patent of the exclusive right to

[*38] manufacture, use, and sell the patented article in a specific territory constitutes a sale of the patent, and that the question of whether an instrument constitutes an assignment or a mere license does not depend upon the name by which it is called but upon the legal effect of its provisions. See Waterman v. MacKenzie, 138 U.S. 252 (1891); see also Glen O'Brien Movable Partition Co. v. Commissioner, 70 T.C. 492, 500 (1978); Henry Vogt Mach. Co. v. Commissioner, T.C. Memo. 1993-371. That is, the use of the label "royalty" to describe the remuneration received is not determinative of its nature as a mere license (thus ordinary income) for tax purposes. Waterman, 138 U.S. at 252. Our conclusion as to whether the transaction constitutes a sale or exchange is based on a review of the circumstances surrounding the transaction as a whole. Id.; see also Graham v. Commissioner, 26 T.C. 730, 739-740 (1956); Mylan Inc. v. Commissioner, T.C. Memo. 2016-45, at *15-*16, *18-*19.

If a person acts as a conduit or middleman, then he or she did not acquire a sufficient interest for a subsequent transfer to qualify as a sale or exchange. See Juda v. Commissioner, 90 T.C. 1263, 1281-1282 (1988), aff'd, 877 F.2d 1075 (1st Cir. 1989); see also Cooper v. Commissioner, 143 T.C. 194, 207 (2014) (citing Juda v. Commissioner, 90 T.C. at 1281) ("[I]n order for the transfer of a patent to qualify as a sale or exchange, the owner must transfer 'all substantial rights' * * *

[*39] to the property."), aff'd, 877 F.3d 1086 (9th Cir. 2017); Kaczmarek v. Commissioner, T.C. Memo. 1982-66 (holding where taxpayers fail to satisfy section 1235 because they failed to transfer all substantial rights in the invention, they also failed to satisfy section 1221, as that holding "appl[ied] with no less force to * * * [the taxpayers'] section 1221 capital asset contention", such that the amounts must be taxed as ordinary income); sec. 1.1235-2(b)(1), Income Tax Regs. (defining "all substantial rights to a patent"). Thus although Juda discusses the middleman concept in a case involving section 1235, it also relies on well-settled principles for what constitutes a sale or exchange of patent rights, such as those described by the U.S. Supreme Court in Waterman. Juda v. Commissioner, 90 T.C. at 1281-1282. Therefore, payment received by a transferor in his or her capacity as a middleman is also not sufficient to qualify for capital gain treatment as defined by section 1222(3). In viewing the circumstances as a whole, we find Dr. Filler was merely a middleman and did not acquire sufficient rights in the 360 patent from WRF. Accordingly, his subsequent transfer to NG, Inc. was not a sale or exchange, for the reasons below. See id.

First, Dr. Filler's "ownership" consisted merely of his limited right to transfer the 360 patent to NG, Inc. within two weeks, for which Dr. Filler paid no consideration. Accordingly, Dr. Filler's rights to the patent would automatically

[*40] revert to WRF if he did not timely transfer the license to NG, Inc. There is also no indication he intended to exploit the patent in any way other than through a subsequent transfer to NG, Inc. In fact, both the incorporation agreement and the preincorporation agreement stated that "it was intended that this method of payment to Dr. Filler will be carried out in place of any compensation for managerial or professional services."

Second, subsequent agreements contradict Dr. Filler's assertion that the WRF-Filler interim note conferred a substantial interest in the 360 patent. The Filler-NG, Inc. licensing agreement was signed on or about December 21, 1998; but only days later, on or about December 29, 1998, WRF and NG, Inc. entered into the WRF-NG, Inc. licensing agreement, which specifically details WRF's compensation structure for its transfer to NG, Inc. of the rights to the 360 patent. That agreement does not involve, reference, or discuss Dr. Filler's rights, if any, in the 360 patent. Indeed, Dr. Filler admits on brief that NG, Inc. purchased the exclusive license in the 360 patent from WRF.

Moreover, there were several transactions involving the 360 patent in later years: (1) a series of assignments by NG, Inc. of the patent rights in 2009 and 2011, (2) three further amendments to those assignments in December 2013, and (3) a signing of a second amended WRF-NG, Inc. licensing agreement in or about

[*41] December 2013.  None of the documents carrying out these transactions reference the WRF-Filler interim note or the Filler-NG, Inc. licensing agreement. Rather, all the agreements reference only the transfer described in the WRF-NG, Inc. licensing agreement.

On the basis of the aforementioned circumstances, we conclude that the WRF-Filler interim note made Dr. Filler merely a middleman.  See Juda v. Commissioner, 90 T.C. at 1281-1282.  He therefore did not acquire a sufficient interest in the 360 patent; thus his subsequent purported transfer to NG, Inc. did not constitute a "sale or exchange."  See id.; see also Waterman, 138 U.S. at 252.[17]

Section 1231 too may afford long-term capital gain treatment for transfers of certain property if net gain exceeds net losses.  Sec. 1231(a)(1) and (2). Generally, section 1231 applies to the sale or exchange of property held for more than one year that is used in a trade or business subject to the allowance of depreciation under section 167.  Sec. 1231(a)(3), (b)(1).  As previously discussed, Dr. Filler did not receive the $100,000 of remuneration in connection with a sale

_____

[17]Given our findings we need not reach the issue of whether in Dr. Filler's hands rights to the 360 patent were a capital asset as defined by sec. 1221(a)(1).

**[*42]** or exchange of property held for more than one year.  He therefore also fails to achieve capital gain treatment under section 1231.[18]

In sum, we find that Dr. Filler is not eligible for section 1235 treatment. Further, he is not entitled to capital gain treatment under other provisions of the Code.  See secs. 1222(3), 1231(b)(1).

III.    Issue 2:  Whether Dr. Filler Is Liable for Self-Employment Tax

The Commissioner also determined that Dr. Filler owes self-employment tax on the $100,000 of proceeds he received from NG, Inc. in 2014.  In addition to other taxes, section 1401 imposes self-employment tax on the amount of self-employment income for each taxable year.  Self-employment income is defined as "the net earnings from self-employment derived by an individual * * * during any taxable year."  Sec. 1402(b).  "Net earnings from self-employment" is defined as the gross income derived from any trade or business carried on by the individual, less deductions.  Sec. 1402(a).  The term "trade or business" has the

---

[18]We also note that respondent makes no argument that the amount at issue constitutes ordinary income under sec. 1239, which eliminates capital gain treatment under other provisions of the Code, see, e.g., secs. 1221, 1231, in transactions involving related parties.  Respondent instead argues that the amounts Dr. Filler received are taxable as ordinary income because sec. 1235 does not apply and the incorporation agreement described Dr. Filler's remuneration as royalties, which are taxable as ordinary income under sec. 61.  As discussed supra note 15, respondent also improperly relies on a post-TCJA version of sec. 1221 to support his position.

[*43] same meaning under section 1402(a), defining "net earnings from self-employment," as under section 162. Sec. 1402(c); Bot v. Commissioner, 118 T.C. 138, 146 (2002), aff'd, 353 F.3d 595 (8th Cir. 2003). "Trade or business" under section 162 has been interpreted to mean an activity conducted "with continuity and regularity" and with the primary purpose of making income or a profit. See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Bot v. Commissioner, 118 T.C. at 146. The carrying on of a trade or business for purposes of self-employment tax generally does not include the performance of services as an employee. Sec. 1402(c)(2); Robinson v. Commissioner, 117 T.C. 308, 320 (2001).

Dr. Filler bears the burden of proof with respect to the self-employment tax issue. See Rule 142(a); Welch v. Helvering, 290 U.S. at 115. He did not pursue an argument on brief with respect to this issue, and therefore we deem the issue conceded. See Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003) (holding that arguments not addressed in posttrial brief may be considered abandoned); Leahy v. Commissioner, 87 T.C. 56, 73-74 (1986) (same). Even if we did not deem the issue abandoned, Dr. Filler admits on brief that in carrying on his trade or business, he facilitated the transfer of the rights in the 360 patent to NG, Inc. In addition, he was integral in defending rights to the 360 patent in litigation and was

**[\*44]** paid for those roles.  We therefore sustain respondent's determination concerning the self-employment tax.

IV.     Issue 3:  Whether Dr. Filler Is Entitled to a Loss Deduction for 2014 for a
        Net Operating Loss Originating in 2012

        A.      Statutory Background and Jurisdiction

Section 172 allows a taxpayer to deduct an NOL for a taxable year.  A taxpayer may generally deduct as an NOL for a taxable year an amount equal to the sum of the NOL carryovers and carrybacks to that year.  Sec. 172(a).  An NOL is defined as the excess of deductions over gross income for a particular taxable year, with certain modifications.  See sec. 172(c) and (d).  Dr. Filler, as the claimant of an NOL deduction, must prove his right thereto.  See Rule 142(a); United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 235 (1955).  As a part of his burden, Dr. Filler must prove that he is entitled to deduct his reported loss under the Code.  See New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); see also INDOPCO, Inc. v. Commissioner, 503 U.S. at 84 (generally, deductions are a matter of legislative grace and not a matter of right); Jones v. Commissioner, 24 T.C. 525, 527 (1955); Allen v. Commissioner, 16 T.C. 163, 166 (1951).

**[\*45]** We have jurisdiction to consider such facts related to years not in issue as may be necessary for redetermination of tax liability for the period before the Court. See sec. 6214(b). This includes jurisdiction to determine the correct amount of taxable income or an NOL for a year not in issue as a preliminary step in determining the correct NOL carryover to a year before us. Lone Manor Farms, Inc. v. Commissioner, 61 T.C. 436, 440 (1974), aff'd without published opinion, 510 F.2d 970 (3d Cir. 1975). We therefore address whether Dr. Filler had a loss in 2012 that warranted his 2014 carryover.

      B.     Dr. Filler's 2012 Carryover to the 2014 Tax Year at Issue

Section 165(a) permits a deduction for any loss sustained during the taxable year and not compensated by insurance or otherwise. Realization is required before a loss may be recognized for tax purposes. Sec. 165(a); United States v. S.S. White Dental Mfg. Co., 274 U.S. 398, 401 (1927); sec. 1.165-1(d)(1), Income Tax Regs. Taxpayers are eligible to claim a loss deduction if the following three requirements are met: (1) there is a closed and completed transaction, (2) fixed by identifiable events, and (3) the loss is actually sustained. Sec. 1.165-1(b), (d), Income Tax Regs. There is no "closed and complete transaction, fixed by identifiable events" for a mere fluctuation in the value of property owned by the taxpayer. Sunset Fuel Co. v. United States, 519 F.2d 781, 783 (9th Cir. 1975)

**[\*46]** (quoting section 1.165-1(b), Income Tax Regs.); see also S.S. White Dental Mfg. Co., 274 U.S. at 401-402; Eisner v. Macomber, 252 U.S. 189 (1920) (mere appreciation in value is not a taxable gain). Rather, an affirmative step, such as abandonment or a sale or exchange, combined with a diminution in value fixes the amount of the loss. Lakewood Assocs. v. Commissioner, 109 T.C. 450, 459 (1997), aff'd without published opinion, 173 F.3d 850 (4th Cir. 1998).

Respondent and Dr. Filler agree that the aforementioned three-part realization test applies in this case. Respondent argues there was no closed and identifiable event that fixed a loss in 2012 because Dr. Filler did not sell his NG, Inc. stock, and the UCLA/GE settlement agreement executed on December 13, 2012 (which precludes Dr. Filler from bringing suit against UCLA in the State of California), does not serve as a closed and complete transaction that fixed the loss. Rather, he continues that Dr. Filler's claimed loss deduction fails because at best there was a mere diminution in value of his NG, Inc. stock.

However, Dr. Filler contends that UCLA infringement was an inverse condemnation of the 360 patent which caused him to realize a tax loss for 2012 on the theory of theft or inverse condemnation that resulted in an involuntary conversion. He insists that the UCLA/GE settlement agreement he signed precludes him from requesting compensation from the State of California for its

**[*47]** purported inverse condemnation[19] and therefore this Court serves as his only avenue for relief. He continues that the UCLA/GE settlement agreement is the closed and completed transaction because there was "no reasonable prospect of recovery," which made his NG, Inc. stock "unsalable" at that point. We disagree; Dr. Filler's position has no merit. For reasons stated below, we agree with respondent.

First, despite the numerous lawsuits involving the 360 patent, no court has found infringement. Dr. Filler insists that we must decide whether UCLA infringed upon the 360 patent. But the law is clear--the United States Tax Court is not the proper forum to litigate a patent infringement claim. 35 U.S.C. sec. 281 (2006) ("A patentee shall have remedy by civil action for infringement of his patent."); 28 U.S.C. sec. 1338(a) (2006) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents[.]"); see also Sheridan v. Commissioner, T.C. Memo. 2015-25, at *8.

---

[19]Dr. Filler often uses patent infringement and inverse condemnation interchangeably. The distinction, however, is that an inverse condemnation suit is based on a sovereign's (here the State of California's) rather than a private party's infringing upon a person's rights in a patent (here the 360 patent). As one court explained: "Inverse condemnation is a legal label for effective expropriation of private property, the sovereign acting indirectly without benefit of formal eminent domain proceedings in condemnation; thus, sovereign acts incompatible with an owner's present enjoyment of his property rights." Wilfong v. United States, 202 Ct. Cl. 616, 619 n.2 (1973).

**[\*48]** Nevertheless, to support his claimed loss deduction for patent infringement Dr. Filler relies on the UCLA/GE settlement agreement as the event that fixes the loss, even though the parties to that agreement did not admit fault, agreed to mutual releases, and covenanted not to sue. His positions are illogical. Dr. Filler's arguments that this Court must decide his infringement claim because the UCLA/GE settlement agreement bars him from bringing suit in the proper forum, while simultaneously insisting that the same settlement agreement fixes his loss, are irreconcilable and have no merit.

Second, NG, Inc. continued to operate well beyond 2012 in pursuit of additional patent infringement claims. The record shows that NG, Inc. received proceeds to settle other lawsuits after the 2012 tax year exceeding $4 million, making it clear that Dr. Filler's NG, Inc. stock was not "unsalable" as he insists and that the UCLA/GE settlement agreement executed in 2012 cannot be considered a closed and completed transaction that fixed his reported loss.

Third, even if NG, Inc. lost value in 2012, Dr. Filler was still a shareholder of NG, Inc. in 2012 and in later years.[20] A corporation is a separate taxable entity

---

[20]Although under sec. 165(g) taxpayers may claim a loss deduction through abandonment without selling their stock, Dr. Filler did not argue that he satisfied those requirements, nor does the record support that he did. See sec. 1.165-5(i), Income Tax Regs.

[*49] from its shareholders.  Moline Props., Inc. v. Commissioner, 319 U.S. 436, 439 (1943) ("The choice of the advantages of incorporation to do business, it was held, required the acceptance of the tax disadvantages."); see also Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 419 (1932) ("The fact is that * * * [the corporation] did have a separate legal existence with privileges and obligations entirely separate from those of its stockholders.").  Dr. Filler did not sell, abandon, or otherwise dispose of his stock in 2012.  Further, NG, Inc., not Dr. Filler, had an exclusive license for the 360 patent that was supposedly infringed upon in 2012.  Indeed, Dr. Filler admits on brief that a loss from the alleged infringement resulting from an inverse condemnation would be NG, Inc.'s loss.  Finally, assuming arguendo that NG, Inc. decreased in value in 2012, Dr. Filler claimed nothing but a mere diminution in value in his stock, which is not a realization event that supports a loss deduction.  See Sunset Fuel Co., 519 F.2d at 783; sec. 1.165-1(b), (d), Income Tax Regs.; sec. 1.165-4(a), Income Tax Regs. ("A mere shrinkage in the value of stock owned by the taxpayer, even though extensive, does not give rise to a deduction under section 165(a) if the stock has any recognizable value on the date claimed as the date of loss.").  Thus, we find that Dr. Filler did not prove that he had a realization event that would support a loss deduction for 2012.  See Sunset Fuel Co., 519 F.2d at 783.

[*50] The remainder of Dr. Filler's arguments are based largely on irrelevant cases and secondary sources, misapplied Code sections (e.g., section 1033--a gain deferral provision--and section 1231--a characterization provision), and outdated versions of the Code. He also eschews well-settled tax principles for claiming a loss deduction such as the establishment of basis and fair market value. See secs. 1001, 1011 (providing that a tax loss occurs when there is a sale or other disposition of property and its adjusted basis exceeds fair market value); sec. 165 (providing that loss deductions are permitted if the specific requirements are met); sec. 165(b); sec. 1.165-1(c)(1), Income Tax Regs. (providing that the amount of a deduction under section 165 is limited to the taxpayer's basis in the asset); see also Rule 142(a); Coloman v. Commissioner, 540 F.2d 427, 429 (9th Cir. 1976) (stating that establishing basis is a question of fact that must be established by the taxpayer),[21] aff'g T.C. Memo. 1974-78; Symington v. Commissioner, 87 T.C. 892,

---

[21]Dr. Filler did not prove his basis in the NG, Inc. stock. He contends that to claim a loss deduction, value is the only part of the analysis that matters. He stated at trial that he argued entitlement to the claimed deduction "as if there was no basis." The Court instructed Dr. Filler to point us to his basis in the NG, Inc. stock on brief. He did not do so. Instead he argued that his basis is irrelevant in calculating his claimed loss. Likewise, there is no evidence that Dr. Filler's basis in the NG, Inc. stock was in excess of zero. See Coloman v. Commissioner, 540 F.2d 427, 429 (9th Cir. 1976), aff'g T.C. Memo. 1974-78.

**[\*51]** 896 (1986) (stating that the fair market value of property is a question of fact for which the burden of proof is on the taxpayer).[22]

On the basis of our examination of the entire record before us, we find Dr. Filler has failed to establish entitlement to a deduction for the loss originating in 2012, and thus he is not entitled to the NOL carryover deduction claimed for tax year 2014. Accordingly, we sustain respondent's disallowance of the NOL carryforward to 2014.

## V. Issue 4: Whether Dr. Filler Is Liable for the Section 6662(a) Accuracy-Related Penalty

### A. Negligence or Substantial Understatement

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any underpayment of Federal income tax which is attributable to negligence or disregard of rules or regulations or a substantial understatement of income tax. Section 6662(c) defines negligence as including any failure to make a reasonable

---

[22]Dr. Filler did not offer any credible evidence to support the value of his reported loss. He relies on his own valuation based on a guess as to value, as follows: In 2012 (1) NG, Inc. was paid $7 million, (2) he owned 75% of NG, Inc., and therefore (3) he had a $5.25 million loss. He did not produce any records, such as balance sheets, receipts, or independent appraisals, or offer any expert testimony at trial to support the value of his reported loss. The Court does not accept Dr. Filler's unsubstantiated self-serving testimony in lieu of documentary evidence. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Therefore, even if there was a realization event (there was not), Dr. Filler has not proven his entitlement to a loss deduction. See supra note 21.

[*52] attempt to comply with the provisions of the Code and defines disregard as any careless, reckless, or intentional disregard. See sec. 1.6662-3(b)(1) and (2), Income Tax Regs. An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). Dr. Filler failed to make a reasonable attempt to comply with the provisions of the Code and failed to keep adequate books and records. Also, Dr. Filler's reported tax was understated by the greater of 10% of the tax required to be shown on the return or $5,000. Thus, respondent has shown both negligence and a substantial understatement of income tax for the year at issue.[23] But see sec. 1.6662-2(c), Income Tax Regs. (providing that generally, the maximum accuracy-related penalty imposed on an underpayment may not exceed 20%).

B.   Supervisory Approval

Respondent has the burden of production under section 7491(c) and must come forward with sufficient evidence that it is appropriate to impose the penalty. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). To satisfy the burden of production under section 7491(c), respondent must produce evidence

---

[23]In the SNOD, the Commissioner also determined penalties under sec. 6662(b)(3) and (6) but abandoned those issues by failing to address them in his posttrial brief and at trial. See Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003); Leahy v. Commissioner, 87 T.C. 56, 73-74 (1986).

**[*53]** showing, inter alia, that respondent's representatives complied with section 6751(b)(1). See Graev v. Commissioner, 149 T.C. 485 (2017), supplementing and overruling in part 147 T.C. 460 (2016). The Court's interpretation of these provisions has evolved since 2017, when Graev was decided, as described below.

Section 6751(b)(1) requires the initial determination of certain penalties to be "personally approved (in writing) by the immediate supervisor of the individual making such determination." See Graev v. Commissioner, 149 T.C. at 492-493. After the trial in this case, and mere days before briefs were due, we issued Clay v. Commissioner, 152 T.C. 223, 248 (2019), and concluded that IRS agents must obtain written supervisory approval for penalties no later than (1) the date on which the IRS issues the SNOD or (2) the date, if earlier, on which the IRS formally communicates to the taxpayer the Examination Division's determination to assert a penalty and notifies the taxpayer of his right to appeal that determination. Id. at 249. We also recently issued Frost v. Commissioner, 154 T.C. 23, 24 (2020), where we held that taxpayers such as Dr. Filler must first challenge the IRS' penalty determination. Then the Commissioner bears the initial burden of production under section 7491(c) to offer evidence that he has complied with the procedural requirements of section 6751(b). Once the initial burden is

**[\*54]** satisfied, the taxpayer must come forth with contrary evidence. See also Belair Woods v. Commissioner, 154 T.C. 1, 16 (2020).

Dr. Filler made such a challenge but introduced no contrary evidence. The trial record contains a penalty approval form signed April 27, 2017, by the examining agent's supervisor and a SNOD that was sent on August 23, 2017, four months later, which would satisfy the supervisory approval requirement under section 6751(b) if there was no prior formal communication of that penalty. Because Clay and Frost could have affected our determination in this case, after the trial briefing had concluded, we ordered the parties to address those decisions, specifically focusing on whether there was a formal communication of the penalty before the SNOD was issued that might necessitate reopening of the record to receive relevant documents into evidence.

In response respondent produced an unsigned copy of a 30-day letter with a declaration from the examining agent's supervisor indicating that she had signed it. Respondent also attached the examining agent's case activity report for the 2014 tax year. Dr. Filler produced the same 30-day letter, but it was signed by the examining agent's supervisor. We have held that a 30-day letter may indeed constitute an "initial determination" for purposes of the supervisory approval requirement of section 6751(b)(1) and that a supervisor's signature on the 30-day

**[\*55]** letter itself is sufficient to establish approval. <u>Cuthbertson v. Commissioner</u>, T.C. Memo, 2020-9, at \*69-\*70; <u>see also</u> <u>Palmolive Bldg. Inv'rs, LLC v. Commissioner</u>, 152 T.C. 75, 85-86 (2019) (citing <u>PBBM-Rose Hill, Ltd. v. Commissioner</u>, 900 F.3d 193, 213 (5th Cir. 2018) ("The plain language of § 6751(b) mandates only that the approval of the penalty assessment be 'in writing' and by a manager[.]")).

Instead of asserting that supervisory approval was not timely, Dr. Filler challenged the efficacy of the signature. While neither party moved for leave to reopen the record, we note that such an action would have been futile.[24] Under either scenario, the 30-day letter or the SNOD serving as the first formal communication, the supervisory approval for the penalty under section 6662(a) was timely. <u>See</u> <u>Frost v. Commissioner</u>, 154 T.C. at 36; <u>Cuthbertson v. Commissioner</u>, at \*69-\*70.

---

[24]Dr. Filler challenged the validity of the supervisor's signature because her declaration includes one that is visibly different from the signature on the 30-day letter. In respondent's response to our order to address Dr. Filler's contention, he attached another declaration of the supervisor, which explained that her signature on the first declaration was an electronic signature used while working from home during the COVID-19 pandemic and that the signature on the 30-day letter was handwritten. The Court recognizes the signature font on the first declaration as one commonly used for electronic signatures; accordingly, even if we admitted the 30-day letters introduced by the parties, Dr. Filler's challenge to the efficacy of the signature would fail.

[*56] Accordingly, respondent's representatives timely complied with section 6751(b)(1). Respondent has met his burden of production in this case. As respondent has done so, it is Dr. Filler's burden to establish that the imposition of the penalty is not appropriate. See Higbee v. Commissioner, 116 T.C. at 447.

C.    Reasonable Cause

Section 6664(c)(1) provides an exception to the section 6662(a) penalty to the extent it is shown that there was reasonable cause for any portion of the underpayment and the taxpayer acted in good faith. The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess his or her proper tax liability. Id. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in view of the taxpayer's experience, knowledge, and education. Id.

Dr. Filler did not make any arguments on brief or at trial regarding the applicability of the reasonable cause exception. And the record does not show that the reasonable cause exception applies in this case.

[*57] Dr. Filler did not address his treatment of the $100,000 NG, Inc. payment but argues on brief that the penalty should not be imposed because during an IRS examination he received information from an agent that his claimed NOL originating in 2012 might be approved by her supervisor.[25] Respondent argued that Dr. Filler did not have reasonable cause because he is highly educated; and although the 2014 return was prepared by a C.P.A. firm, the loss carried forward on that return was based on amended returns Dr. Filler prepared for 2010 through 2013. Respondent continues that there was no evidence that Dr. Filler relied on a return preparer in support of characterizing the amount paid to Dr. Filler by NG, Inc. as capital gain or the allowance of the NOL carryover crafted by Dr. Filler, not his C.P.A. Furthermore, his C.P.A. did not testify at trial. Even assuming that during the IRS examination there was discussion of the NOL's being allowed, respondent points out that Dr. Filler admitted on brief and at trial that he knew any allowance of a loss deduction required approval by the examining agent's manager, and there was no such approval when he claimed the NOL carryover deduction on his 2014 return.

We agree with respondent; Dr. Filler is a highly educated doctor, lawyer, professor, and inventor who has not satisfied his burden to prove reasonable cause

---

[25]We note there is no evidence in the record to support his assertion.

**[*58]** and good faith for any portion of the underpayment.  Therefore, we sustain respondent's determination that Dr. Filler is liable for the accuracy-related penalty for the year at issue.

We have considered all the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing, and concessions of Dr. Filler,

<u>Decision will be entered for</u>

<u>respondent</u>.